**Thomas B. Slocum, Esq.**
**NORRIS McLAUGHLIN, P.A.**
400 Crossing Blvd, 8th Floor
Bridgewater, New Jersey 08807-5933
Main:  908-722-0700
Direct: 908-252-4249
Email: tslocum@norris-law.com
*Attorneys for Intervenor CrossCountry Mortgage LLC*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | UNITED STATES DISTRICT COURT |
| | : | FOR THE DISTRICT OF NEW JERSEY |
| Plaintiff, | : | |
| | : | Criminal No. 24-712 (BRM) |
| v. | : | |
| | : | |
| CHRISTOPHER J. GALLO, | : | **DECLARATION OF** |
| | : | **THOMAS B. SLOCUM, ESQ.** |
| Defendant. | : | |
| | : | |

I, THOMAS B. SLOCUM, of due age, hereby declare as follows:

1.      I am an Attorney at Law in the State of New Jersey, admitted to practice and appear in this District, and a member of the law firm Norris McLaughlin, P.A., attorneys for proposed Intervenor CrossCountry Mortgage LLC.  I submit this Declaration in support of CrossCountry Mortgage LLC's motion to intervene and vacate this Court's November 24, 2025, Order staying an arbitration proceeding between CrossCountry Mortgage LLC and Christopher J. Gallo, Defendant in this matter.

2.      Attached hereto as **Exhibit A** is a true and correct copy of a Statement of Claim and exhibits submitted to the American Arbitration Association in the arbitration captioned *CrossCountry Mortgage LLC v. Christopher Gallo*, AAA Case No. 01-25-0005-5239, provided to me by counsel representing CrossCountry Mortgage LLC in that arbitration proceeding.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 3, 2025                                    /s/ Thomas B. Slocum
                                                              Thomas B. Slocum

# **Exhibit A**

## BEFORE THE AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| **CROSSCOUNTRY MORTGAGE, LLC** | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | Arbitration No. |
| **v.** | ) | |
| | ) | |
| **CHRISTOPHER GALLO** | ) | |
| | ) | |
| **Respondent.** | ) | |

## STATEMENT OF CLAIM

### Introduction

Claimant CrossCountry Mortgage, LLC ("**CCM**") brings this arbitration to recover two million one hundred thousand dollars ($2,100,000.00), plus all reasonable costs, fees, expenses, and interest, from former employee, Respondent Christopher Gallo ("***Mr. Gallo***"), for repayment of a sign-on bonus. Under the terms of the applicable agreement between the parties to this arbitration, because Mr. Gallo left CCM's employment within three years of his hiring, Mr. Gallo was contractually obligated to repay CCM this sign-on bonus. CCM reminded Mr. Gallo of his repayment obligation following his termination, but Mr. Gallo has refused to make the contractually required repayment.

### CCM Hires Mr. Gallo and Pays Him a Sign-On Bonus

CCM is a national residential mortgage lender. In September 2023, CCM hired Mr. Gallo as an Originating Branch Manager for a CCM branch office in New Jersey. As part of his duties, Mr. Gallo was hired to sell CCM mortgage loan products and services to

residential mortgage customers, as well as managing and supervising the day-to-day operations of one of CCM's branch offices. (*See* "***Originating Branch Manager Employment Agreement***" ("***Employment Agreement***") with DocuSign Certificate and History attached as Exhibit A at ¶ 1.4).[1]

In September 2023, Mr. Gallo also signed and entered into a bonus agreement with CCM. (*See* "***Original Bonus Agreement***" with DocuSign Certificate and History attached as Exhibit B). Per the *Original Bonus Agreement*, CCM agreed to pay Mr. Gallo a sign-on bonus of two million one hundred thousand dollars ($2,100,000.00) (the "***Sign-On Bonus***") over six equal installments. (*Id.*, ¶ 2).

CCM paid Mr. Gallo the first three installments of his Sign-On Bonus in September and October 2023. However, in November 2023, Mr. Gallo asked CCM to defer the remaining three installments to the following year for tax purposes. Pursuant to Mr. Gallo's request, CCM sent him a "revised" bonus agreement with substantively identical terms as the Original Bonus Agreement but reflecting the updated dates of payment. Mr. Gallo signed and entered into the revised agreement he requested. (*See* "***Revised Bonus Agreement***" with DocuSign Certificate and History attached as Exhibit C). CCM paid Mr. Gallo the remaining

---

[1] The *Employment Agreement* also provided, *inter alia*, that Mr. Gallo's employment was at-will (¶ 3.1); that he understood that he had to be truthful and accurate on all loan applications (*id.* at ¶ 1.11); that he did not know of any reason why he should not accept an offer of employment from CCM (*id.* at ¶ 1.9(b)); and that Mr. Gallo understood that if any representation was breached or that if there was any legal impediment to his performing his job at CCM, that, in and of itself, was grounds for termination. (*Id.* at ¶ 1.9(e)).

Sign-On Bonus installments in January and February 2024. The Sign-On Bonus was paid in full.

Contractually, under the Revised Bonus Agreement, Mr. Gallo agreed to repay CCM the entire Sign-On Bonus if he did not remain employed at CCM for thirty-six months:

> The Parties agree that the Bonus is a recoverable bonus. To earn the Bonus, Employee must remain continuously employed with Company for thirty six (36) months starting on the Employee's first day of employment with Company (the "Vesting Period"). If Employee does not remain continuously employed with Company for the full Vesting Period, Employee must return the Bonus in full to Company, as set forth in Paragraph 3.

(*See Revised Bonus Agreement* at ¶ 2).

Pursuant to the *Revised Bonus Agreement*, Mr. Gallo also expressly agreed to submit all disputes arising out of or relating to the *Bonus Agreement* to binding arbitration under the Federal Arbitration Act. *Id.* at ¶ 11. Specifically, the contractual arbitration clause states, in relevant part:

> 11. **ARBITRATION; JURY WAIVER; COLLECTIVE ACTION WAIVER**. Employee agrees and acknowledges that Company and Employee will utilize binding arbitration to resolve all disputes arising out of or relating to this Agreement. Both Company and Employee mutually agree that any claim, dispute and/or controversy that either Employee may have against Company (or its owners, directors, officers, managers, employees, and agents) or Company may have against Employee, arising from, related to, or having any relationship or connection whatsoever with this Agreement, shall be submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act ("FAA"). Included within the scope of this Arbitration Agreement are all disputes, whether based in tort, contract, statute, equitable law, or otherwise.

*Id.* The *Revised Bonus Agreement* further states that CCM and Mr. Gallo mutually agreed that the arbitration shall be administered by the American Arbitration Association:

> In addition to any other requirements imposed by law, disputes shall be settled by binding arbitration administered by the American Arbitration Association ("AAA") before a qualified individual, to whom the parties may mutually agree pursuant to AAA's Employment Arbitration Rules and Mediation Procedures (found at https://www.adr.org), and shall be subject to disqualification on the same grounds as would apply to a judge of such court.

*Id.* at ¶ 11 (b).

### Mr. Gallo Breaches the Bonus Agreement by Failing to Repay CCM

On or around April 24, 2024, CCM learned that Mr. Gallo had been arrested and indicted on federal charges of alleged mortgage fraud. According to the indictment, between 2018 and 2023, while employed by a prior mortgage company, Mr. Gallo allegedly falsified loan origination documents at his employer to fraudulently secure mortgage loans in violation of multiple federal statutes. CCM terminated Mr. Gallo immediately after discovering these allegations – the termination was less that than thirty-six months after he began working for the company. Eventually, Mr. Gallo was federally charged with conspiracy to commit bank fraud, bank fraud, making false statements to a financial institution, and aggravated identity theft. His criminal matter remains pending as *United States of America v. Christopher J. Gallo and Mehmet Ali Elmas*, Crim. No. 24-712, in the United States District Court for the District of New Jersey.

At the time of his termination, CCM sent Mr. Gallo a letter demanding repayment of the Bonus. (*See* "***Demand***" attached as Exhibit D). Mr. Gallo has refused to pay and has not met his contractual obligation to repay the Sign-On Bonus. Therefore, Mr. Gallo has: (1)

breached his contract with CCM, and (2) been unjustly enriched by his actions described herein.

Accordingly, CCM seeks repayment of the two million one hundred thousand dollars, ($2,100,000.00) Sign-On Bonus pursuant to the contract between CCM and Mr. Gallo, plus all reasonable costs, fees, expenses, and interest incurred in this action.

Respectfully submitted,

**KOHRMAN JACKSON & KRANTZ LLP**

*/s/ Brett S. Krantz*
Brett S. Krantz (0069238)
Jeffrey R. Vaisa (0096010)
One Cleveland Center
1375 East Ninth Street, 29th Floor
Cleveland, Ohio 44114
Telephone: (216) 696-8700
Email: bk@kjk.com; jrv@kjk.com

5

# CROSSCOUNTRY MORTGAGE™



## ORIGINATING BRANCH MANAGER EMPLOYMENT AGREEMENT

This Originating Branch Manager Employment Agreement ("Agreement"), dated as of **DATE OF HIRE** ("Effective Date"), is between CrossCountry Mortgage, LLC, a Delaware limited liability company ("Company") and **Christopher J Gallo** ("Employee") (individually, each a "Party," and collectively, the "Parties").

WHEREAS, the Parties desire that Employee work in the employment of Company as the manager of Company's branch office located at **New Jersey** (the "Branch"); and

WHEREAS, the Parties desire to set forth their agreement with respect to such employment in this Agreement;

NOW, THEREFORE, in consideration of the promises and mutual covenants set forth herein, the consideration for which receipt and sufficiency are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## EMPLOYMENT AND DUTIES

1.1    Commencement.  On the terms set forth herein, Company employs Employee, and Employee agrees to be employed by Company as provided for herein.

1.2    Duty to Comply with Company Policies.  Employee shall comply with all duties and requirements imposed on Employee, as a branch manager, loan officer and employee, as set forth in this Agreement and the manuals, guides, memoranda, e-mails and other materials that set forth Company's policies and procedures ("Company Policies"), and shall cause all employees of Company who are assigned to work at the Branch (the "Branch Employees") to comply with the Company Policies.  The Company Policies are effective as of the date of issuance, unless otherwise specified.  Company may modify the Company Policies at any time in its sole discretion.

1.3    Contracts.  Employee does **NOT** have the authority to enter into contracts on behalf of the Company.  All contracts must be approved and executed by an Officer of the Company.

1.4    General Duties.
       (a)    Employee's primary duty shall be managerial.  Employee shall at all times devote substantially more than fifty percent (50%) of Employee's working hours to supervising and managing the day-to-day affairs of the Branch, including all Branch Employees.  In this regard, Employee's managerial functions (collectively "Managerial Duties") shall include without limitation:

              (i)    Developing and maintaining an attitude of teamwork, establishing a culture consistent with Company's corporate mission statements, and ensuring employees abide by the Company Policies;
              (ii)    With corporate approval, recruiting staff for the Branch, reviewing payroll information and communicating with Company's Human Resources Department on personnel changes, including recommendations for new hires and terminations;
              (iii)    Reviewing monthly commission calculation worksheets, remaining cognizant of their contents, modifying Branch efforts to keep results in line with expectations, and preparing and submitting periodic production projections in accordance with the Company Policies and Company's expectations;
              (iv)    Developing and maintaining a network of relationships with existing and prospective clients, promoting the image and reputation of Company as creative, dynamic and competitive, expanding Company's market share through the promotion of Company's business and sales, and actively holding sales meetings, training seminars, and other events (and ensuring attendance of such events by Branch Employees); and
              (v)    Assisting Company's management in the development of a successful group of employees.

       (b)    Employee may also sell mortgage loan products and services to residential mortgage customers provided, however, Employee shall not permit these production duties to prevent Employee from devoting

1

substantially more than fifty percent (50%) of his/her work time performing Managerial Duties.  Employee's sales duties shall include without limitation:

      (i)     Identifying potential mortgagors, acquiring a full understanding of, and analyzing, their respective financial needs, based on their individual financial health, economic goals and credit history;

      (ii)     Working with clients to create loan packages that meet their particularized needs and goals, while guiding them through the complex requirements of the various lenders;

      (iii)     Educating clients regarding mortgage loans generally, the mortgage loan process, the different types of loans available, and how costs and payments can vary under the numerous alternatives available, so clients can make informed decisions in acquiring the appropriate loan to fit their respective needs;

      (iv)     Originating mortgages, and handling client questions and complaints; and

      (v)     Overseeing the loan transaction from initiation, through processing, approval, closing and recording, including ensuring that required disclosures are delivered to applicants, while ensuring that the client understands and is satisfied with the process, and that the activities undertaken comply with Company and industry guidelines and policies.

      (c)     Employee shall also perform any other or additional duties that are assigned by Company from time to time or that are contained in this Agreement or in the Company Policies. As an employee, Employee agrees to perform the duties that Company may, in its discretion, require and direct.  Employee agrees that Company has the right in its sole discretion, with or without cause, to modify all job assignments and compensation, including the terms of any Employee incentive pay or commissions, to change job titles, to reassign Employee to another location or division, or to reassign Employee's responsibilities throughout the course of Employee's employment with Company and that this Agreement shall be binding upon Employee at all times, irrespective of any such changes.  Employee's authority and services shall be subject to the direction of Company's officers and managers.

      (d)     Employee agrees that, as a Company Originating Branch Manager, Employee owes and is charged with the following duties and standards of conduct, among others specified elsewhere in this Agreement and in the Company Policies: (i) to exercise his/her duties and judgments in the best interest of Company and in good faith; (ii) to use extraordinary care, skill, and diligence in the performance of his/her duties; and (iii) to meet at all times Company's expectations and standards, as Company determines (and may modify) in its sole discretion.

      (e)     Employee understands and acknowledges that the foregoing description of Employee's duties is intended to establish, and does establish, Employee as an "executive employee," as defined under applicable law.  Employee further understands and acknowledges that, as such, Employee is exempt from any provisions requiring payment of any minimum wage or overtime premiums.

      1.5     <u>Duty of Loyalty</u>.  Employee shall devote appropriate time and attention to his/her activities for and on behalf of Company and shall not engage in any conflict of interest or conduct which shall reflect adversely upon Company.  Employee shall assist and work for only Company and no other employer, lender, broker, or other entity, and shall not engage in any way in any mortgage lending or brokering, loan processing or underwriting services, loan modification services, real estate sales or acquisition, closing, settlement or title-related services, credit repair, credit counseling, borrower assistance or other business or service of the same or similar nature.  Additionally, Employee may not own an interest in any entity engaging in any such activities, other than a passive investment of less than one percent (1%), without the prior written consent of Company. While employed by Company, Employee shall not, whether for remuneration or otherwise: (i) serve as an officer, director, or executive of or (ii) be employed or engaged as a consultant, independent contractor, or in any other capacity by, any other business (i.e., through any IRS-W-2, IRS-1099, staffing company, employee leasing, partnership, company affiliation, or other arrangement), except as approved in advance in writing by the President of Company.

      1.6     <u>Regulatory Compliance</u>.  Employee is familiar with and shall comply, and cause the Branch Employees to comply, with the Company Policies and all applicable federal, state and local laws, ordinances, rules, regulations, guidelines and other requirements pertaining to the mortgage banking industry, to the business of Company, and to the origination, processing, underwriting, closing, or funding of mortgages, or other activities of Company, including but not limited to the Equal Credit Opportunity Act, Gramm-Leach-Bliley Act, Truth in Lending Act, Real Estate Settlement Procedures Act, USA PATRIOT Act, Home Mortgage Disclosure Act, Federal Trade Commission Act, Telemarketing and Consumer Fraud and Abuse Prevention Act, Fair Credit Reporting Act, Fair Housing Act, Secure and Fair Enforcement for Mortgage Licensing Act of 2008 (the "SAFE Act"), Dodd-Frank Wall Street Reform and Consumer Protection Act and all related regulations to the foregoing Acts, and all similar federal, state and local laws, rules, regulations and requirements, federal and state telemarketing and do-not-call laws, rules and regulations, and all applicable guidelines and requirements of the Consumer Financial Protection Bureau ("CFPB"), United States Department of Housing and Urban Development ("HUD"), Department of Veterans Affairs ("VA"), Federal Home Loan Mortgage Corporation

("FHLMC" or "Freddie Mac"), Federal National Mortgage Association ("FNMA" or "Fannie Mae"), Government National Mortgage Association ("GNMA" or "Ginnie Mae"), United States Department of Agriculture ("USDA") and all other applicable agencies, investors and insurers (altogether, the Company Policies and all such applicable laws, rules, regulations, guidelines and other requirements are referred to herein as the "Applicable Requirements"), in each case as amended from time to time.  Employee agrees to develop and maintain his/her knowledge and understanding of all such Applicable Requirements.  For purposes of emphasis, and without limitation of the foregoing, for the entire term of this Agreement, Employee shall:

(a)     Not charge, nor allow any Branch Employee to charge, any consumer any fees in excess of that permitted under Applicable Requirements;

(b)     Ensure compliance with all applicable (i) federal licensing, registration and training requirements, including without limitation those pursuant to the SAFE Act, (ii) state licensing, registration and training requirements of each state where Employee or any Branch Employee engages in loan origination activities, and (iii) the registration and compliance requirements of the Nationwide Mortgage Licensing System & Registry ("NMLSR"), for all Branch Employees;

(c)     Comply with the Regulation Z provisions on loan originator compensation, steering and qualification (codified as 12 C.F.R. §1026.36), as it may be amended from time to time;

(d)     Immediately report to Company any lawsuits, complaints, investigations or other similar actions which involve Employee's duties on behalf of Company or which could potentially affect Employee's licensing status or ability to perform his or her job for Company.  Employee shall immediately notify Company in writing of any change in the status to his/her licenses, authorizations, and/or certifications and of any change to the background or qualification information submitted in support of such licenses, authorizations, and/or certifications. As a condition of Employee's initial and ongoing employment, Employee shall provide complete and accurate information to Company and to the various state and federal regulators. Employee authorizes Company to disclose, exchange, and discuss information regarding his/her background and qualifications with the various state and federal regulators; and

(e)     Abide by Company's policy to fully support equal opportunities in housing and lending and the laws and principles pertaining thereto. Employee agrees to, and shall, conduct his/her endeavors in full compliance therewith and shall strictly abide by all applicable fair housing and lending laws.

1.7     <u>Certain Restrictions and Requirements</u>.  Except as expressly provided herein, Employee will not, and shall have no authority to (and will cause the Branch Employees not to):

(a)     Close or arrange for the closing of any loan in the name of any person or entity other than Company, unless authorized in advance by Company.

(b)     Use any name, trade name, trade mark, service mark or logo of Company or an affiliate of Company for advertising, marketing or other business purposes without the prior written approval of an officer of Company.

(c)     Incur any expenses or obligations on behalf of Company unless permitted in the Company Policies or unless Company provides its prior written approval.  Employee shall promptly submit invoices and other supporting documentation for reimbursement of permitted expenses in accordance with the Company Policies.

(d)     Undertake or implement any business development plans or activities, without the prior approval of Company.

(e)     Use any forms or documents in connection with any application or origination of any loan, other than those forms and documents provided to the Branch by Company or otherwise approved by Company.  If Employee or a Branch Employee desires to use any form or document not provided to the Branch by Company, Employee must first submit the item to Company for approval.

(f)     Use any Company e-mail addresses or technology, other than for the performance of Employee's and the Branch Employee's respective duties on behalf of Company.

1.8     <u>Remittance of Funds</u>.  Employee shall not open, operate, or attempt to open or operate, any bank account in Company's name or any similar name.  All monies received by Employee for Company or on Company's behalf are funds belonging to Company and shall be made payable to Company.  All Company monies are held by

Employee in trust for Company. Employee shall cause all fees, charges, funds, and other amounts received by Employee, by any Branch Employee or by the Branch to be remitted to the applicable office of Company in accordance with the Company Policies.

      1.9   <u>Certain Employee Representations</u>. Without limiting any obligations of Employee, Employee hereby represents and warrants to Company at all times during employment as follows:

      (a)   Employee's employment with Company will not violate or conflict with any obligations Employee owes to any individual or entity, including without limitation, obligations arising out of or relating to (i) any non-compete, non-disclosure, non-solicitation or confidentiality agreements or provisions, and (ii) any prior employer or employment.

      (b)   Employee knows of no reason why Employee could not or should not accept an offer of employment from Company, or otherwise be employed by Company. Employee has not been subject to any investigation or sanction of any type, or denied any license or approval, by any federal, state or local government, quasi-government and private industry authority, including but not limited to any licensing authority, that would adversely affect Employee's license(s), authorizations or ability to perform his or her duties for Company.

      (c)   In the ten (10) years immediately preceding the date of this Agreement, there has not been and there is not currently any outstanding orders, judgments, injunctions, awards or decrees of any court, governmental or regulatory body or arbitration tribunal against or involving Employee or his/her assets and there have been no actions, suits, administrative proceedings or claims against Employee, or, to his/her knowledge, pending, nor any actual or threatened investigations involving Employee and his/her assets that would adversely affect Employee's license(s), authorizations or ability to perform his or her duties for Company. In the ten (10) years immediately preceding the date of this Agreement and presently, Employee and any company or firm of Employee have not filed for bankruptcy nor been declared bankrupt or insolvent.

      (d)   Employee currently possesses, and at all relevant times has maintained in good standing, any and all licenses, registrations and authorizations required to conduct business as a loan officer and branch manager for each state in which such business will be conducted.

      (e)   In the event of a breach of the representations and warranties of Employee in this Section or if there is any other legal impediment which prevents Employee from entering into this Agreement or from performing all of his/her obligations hereunder, Company may terminate Employee's employment upon becoming aware of such breach of impediment and, in such event, Company shall have no financial or other liability or obligation to Employee under this Agreement. Any termination pursuant to this Section shall be by written notice to Employee and shall be effective on the date such notice is sent. Employee hereby acknowledges that he/she has been informed that Company strictly forbids the solicitation of any actual or prospective customers from any previous employment, either as an employee or independent contractor, for the purpose of switching these customers' loans from the previous employer to Company. Employee further represents that he/she has not taken any written records, computer disks, or other materials which are the property of any previous employer and shall not use any such written records or computer disks to solicit any loan applications or perform his/her duties hereunder.

      1.10   <u>Committing Rates and Pricing</u>. Employee shall lock loans in accordance with Company Policies and lock with Company's secondary marketing department the same program, rate and price that were committed to the customer.

      1.11   <u>Truthfulness</u>. At all times during the term of this Agreement, Employee agrees not to withhold or misrepresent material facts with regard to an applicant's income, assets, investments, debts, obligations, circumstances and information on the subject property. It is Employee's obligation and responsibility to disclose any and all information regarding an applicant's state of affairs that would customarily be taken into consideration in the evaluation of an applicant's creditworthiness. At no time will Employee advise an applicant to provide, or assist an applicant in providing, inaccurate information in relation to a loan application.

**ARTICLE II**
**EMPLOYEES**

4

2.1    <u>Branch Employees</u>.  Company shall be entitled to conduct interviews and background checks on all Branch Employees prior to their hire date by Company, in the same manner as Company might or could do in making any other employee hiring decision generally.  All Branch Employees will be hired as new employees of Company, and Company shall have no liability or responsibility for any obligation or liability related to any period of time prior to the time of such hiring.  While Company will consider Employee recommendations regarding hiring, discipline and termination, all decisions to hire, terminate and discipline employees shall be made solely by Company and are solely within Company's discretion.  Employee shall, and shall cause all Branch Employees to, participate in training sessions as required by Company from time to time.

**ARTICLE III**
**TERM AND TERMINATION**

3.1    <u>At-Will Employment</u>.  Notwithstanding anything to the contrary herein:  (a) the Parties hereby agree and acknowledge that the employment relationship between them is wholly an "at-will" relationship, and neither Party shall have any obligation (whether arising by law, implication, custom or otherwise) to extend, maintain or continue Employee's employment with Company; (b) Employee's employment can be terminated at will, with or without cause, and with or without reason, at any time,; (c) no employee or representative of Company has the authority to modify this at will nature of the employment except for the President of Company, and any such modification must be in a specific written agreement signed by both Employee and Company by its President.

3.2    <u>Termination upon Death or Disability</u>.  If Employee becomes Disabled (as defined below) or dies while employed hereunder, Employee's employment and Employee's rights to compensation hereunder shall automatically terminate (without notice) at the close of business on the date on which death or disability occurs.  For purposes of this Agreement, Employee shall be deemed to have become "Disabled" upon Employee's inability to perform the essential functions of Employee's job, because of Employee's physical or mental illness or other incapacity which substantially limits a major life activity, for a continuous period of six (6) months or more, or a total of twenty-six (26) weeks in the aggregate within any twelve (12) month period.  Employee understands that the ability to report to work on a regular basis is considered an essential function of his/her position.  Company shall pay Employee any compensation earned by Employee as of the date of such termination in accordance with the normal payroll practices of Company or as otherwise required under applicable law.

3.3    <u>Company Property</u>.  All loans initiated and handled by Employee while employed by Company, and all related information, shall at all times remain the sole and exclusive property of Company.  Employee agrees to promptly return to Company immediately upon request, at any time, and upon termination of employment, all Company property, including office keys, access cards, any electronic communications equipment issued by Company, documents, files, correspondence and notes, containing or relating to Confidential Material (defined below), and including but not limited to information obtained from the customers and prospective customers contacted by Employee, and the loans handled by Employee, while employed by Company, without keeping any copies.  Employee shall assist Company in securing all original loan files and copies thereof, as requested by Company.

**ARTICLE IV**
**COMPENSATION AND BENEFITS**

4.1    <u>Compensation</u>.  At all times during Employee's employment, as full compensation, Company hereby agrees to pay Employee as set forth below and in the commission schedule attached hereto as <u>Exhibit A</u>.  Company at all times shall have the right to modify the applicable compensation formula on a prospective basis upon notice to Employee.  Compensation shall be paid to Employee at such times and in a manner consistent with Company Policies as may be in effect from time to time.

4.2    <u>Benefits</u>.  While employed by Company, Employee shall be entitled to the rights and benefits under any employee benefit plans provided by Company to similarly situated employees.  Nothing in this Agreement or in any other agreement between Company and Employee shall prevent Company from terminating or amending, in any manner, any Employee benefit, policy or benefit plan at any time or from time in its sole discretion, and Company shall have no liability or obligation to Employee in connection with any such termination or amendment.  Employee's eligibility for benefits shall be determined pursuant to the plan documents.

4.3    <u>Compensation at End of Employment</u>.  Upon cessation of Employee's employment, for any reason, Employee shall be paid any compensation earned up to and including the date employment ends.  Except as otherwise expressly provided herein, or required by applicable law, Employee shall not be entitled to any further compensation, including (but not limited to) draws, benefits, fringe benefits, commissions, or bonuses, as applicable.  Notwithstanding the foregoing, if on the date the Employee ceases to be employed, a loan is in Employee's pipeline and has closed and funded, and according to when commission is calculated in the normal pay roll cycle; as of the date of termination, resignation, or separation from the Company, and the loan meets the criteria of an Eligible Loan (as defined in Exhibit A and excluding element "(d)" of the definition), then the Employee shall be paid the commission for such loan.  Stated

differently, Employee will NOT be paid on loans the close and fund after the Employee's last day of employment. The commission, if any, will be paid within thirty (30) days after the end of Employee's employment. Employee hereby covenants not to attempt to move any pipeline loan to any other person or entity following the end of employment.

4.4    Withholding.  Employee acknowledges that all compensation earned under this Agreement shall be subject to applicable withholding and deductions.

4.5    Sole Compensation.  Other than as provided for in this Article "**Compensation and Benefits"**, Employee shall not be entitled to any other compensation or benefits.

**ARTICLE V**
**PROTECTED INFORMATION AND**
**RESTRICTIVE COVENANTS**

5.1    Protected Information.

(a)    *Confidentiality*.  Employee hereby acknowledges, understands and agrees that all "Confidential Material," as defined below, is the exclusive and confidential property of Company which shall at all times be regarded, treated and protected as such in accordance with this Article "**Protected Information and Restrictive Covenants**".  Employee acknowledges that all such Confidential Material is in the nature of a trade secret.  For purposes of this Agreement, "Confidential Material" means information, which is available to or used in the business of Employee and (i) is proprietary to, about or created by Company, (ii) gives Company a competitive business advantage or the opportunity of obtaining such advantage or the disclosure of which would be detrimental to the interests of Company, or (iii) is designated as Confidential Material by Company, is known by Employee to be considered confidential by Company, or from all the relevant circumstances should reasonably be assumed by Employee to be confidential and proprietary to Company.  Such Confidential Material includes, without limitation, the following types of information and other information of a similar nature (whether or not reduced to writing or designated as confidential):

(i)    Internal personnel and financial information of Company, purchasing and internal cost and revenue information, internal service and operational manuals, computer software and systems and the manner and methods of conducting the business of Company;

(ii)    Company personnel names and contact information;

(iii)    Employee's compensation arrangements with Company;

(iv)    Training and educational materials provided by Company to Employee;

(v)    Marketing materials and/or marketing plans provided by Company to Employee; and

(vi)    Confidential and proprietary information provided to Company by any actual or potential customer, or other third party (including businesses, consultants and other entities and individuals), and shall include, without limitation, all of the customer's "non-public personal information," as that term is defined under the Gramm-Leach-Bliley Act of 1999 and any amendments thereto.

(b)    *Non-Disclosure*.  As a consequence of Employee's acquisition or anticipated acquisition of Confidential Material, Employee shall occupy a position of trust and confidence with respect to the affairs and business of Company.  In view of the foregoing and of the consideration to be provided to Employee, Employee agrees that it is reasonable and necessary that Employee make each of the following covenants:

(i)    At any time during the term of this Agreement and thereafter, except as required by law, Employee shall not disclose Confidential Material to any person or entity, either inside or outside of Company, other than as necessary in carrying out the business of Employee, without first obtaining Company's prior written consent (unless such disclosure is compelled pursuant to court orders or subpoena, and at which time Employee shall give immediate notice of such proceedings to Company).

(ii)    At any time during the term of this Agreement and thereafter, Employee shall not use, copy or transfer Confidential Material other than as necessary in carrying out the business of Company, without first obtaining Company's prior written consent.

(iii)    Upon termination of this Agreement, Employee shall promptly deliver to Company (or its designee) all written materials, records, software and documents made by Employee or which came into his/her possession prior to or during the term of this Agreement, concerning the business and affairs of Company, including, without limitation, all materials containing Confidential Material.

5.2    Rights to and Protection of Company's Intellectual Property and Inventions.  Employee agrees that Company is engaged in a continuous program of research, development, and innovation in connection with its business and the technologies, information and methodologies employed within its business; that Company's "Inventions" and "Intellectual Property" (as those terms are defined in this section) and information pertaining thereto are extremely

6

valuable to Company; and that it is critical for Company to preserve and protect its Confidential Material and its rights in Inventions and in all of its Intellectual Property as set forth in this Agreement.

(a) For purposes of this Agreement, the term "Intellectual Property" means all of Company's intellectual property including, but is not limited to: trademarks, logos, trade names, trade secrets, Confidential Material, copyrights, copyrightable works, non-copyrightable works, patents, domain names, database rights, customer lists, prospect lists, methodologies, know-how, websites, web-pages, search engines, designs, applications, data, programs, phone numbers, pager numbers, fax numbers, cell phone numbers, email addresses and accounts, and the like.

(b) For purposes of this Agreement, the term "Inventions" means Company's inventions, improvements, designs, ideas, original works of authorship, formulas, algorithms, processes, techniques, compositions of matter, software programs or routines, compilations, databases, data results, know-how, websites, web pages, search engines, computer functionality, mask works or trade secrets.  The term Inventions is not intended to include any inventions that Employee developed entirely on his/her own time without using Company's equipment, supplies, facilities, or trade secret information except for those inventions that either: (i) relate at the time of conception or reduction to Company's business or to anticipated research or development of Company; or (ii) result from any work Employee performed for Company.

(c) Employee agrees: (i) to do all things necessary in every proper way to assist Company to obtain, maintain and enforce its intellectual property protection for Company's Inventions and Intellectual Property rights; (ii) to sign documents that Company may reasonably request to obtain protection for Company's Inventions and Intellectual Property rights; (iii) to maintain the confidentiality of and guard the secrecy of Company's Inventions and Intellectual Property rights; (iv) that his/her obligations under this Section, Rights to and Protection of the Company's Intellectual Property and Inventions, will continue even after Employee leaves Company, and that Company will reimburse Employee at a reasonable rate after Employee leaves Company for out of pocket expenses actually incurred by Employee on its behalf in order to secure its Inventions and Intellectual Property rights; (v) that in the event Company is unable for any reason whatsoever to secure Employee's signature to any lawful and necessary document required or reasonably desired by Company to apply for, transfer or renew any patent, copyright, trademark, domain name, Invention or Intellectual Property right, Employee hereby designates and appoints Company (and its duly-authorized officers) as his/her agent and attorney-in-fact to act for and on behalf of Employee, to execute any such application, transfer or renewal documents and to do all other lawfully permitted acts to further the application, transfer or renewal of any of Company's patent, copyright, trademark, domain name, Invention or Intellectual Property right with the same legal force and effect, as if executed by Employee; and (vi) that during the course of employment, Employee agrees to promptly disclose in confidence to Company all Inventions, including, but not limited to, improvements, designs, ideas, original works of authorship and/or trade secrets, that Employee conceives of, makes or creates, and/or that Employee first reduce to practice (either alone or jointly with others), whether or not in the course of employment, and whether or not such Inventions are patentable, copyrightable or protectable as trade secrets.

(d) Works for Hire. Employee agrees that all Inventions, Intellectual Property, and Confidential Material (including but not limited to copyrightable works) that Employee conceives, contributes to and/or prepares within the course and scope of his/her employment are "works for hire," which shall be the exclusive property of Company.

(e) Assignment. Employee agrees that all Inventions, Intellectual Property, and Confidential Material: (i) developed using equipment, supplies, facilities, information, trademarks, trade names, copyrights, Confidential Material, Intellectual Property, goodwill, know-how, or trade secrets of Company; (ii) resulting from work performed by Employee for Company; and/or (iii) relating to or used by Employee in Company's business (including but not limited to personal websites, personal email addresses/accounts, marketing materials, phone numbers, cell phone numbers, and screen names), are the sole and exclusive property of Company.  Employee hereby assigns and transfers to Company any and all right or rights which may arise in or to any such Inventions, Intellectual Property and Confidential Material.

(f) No "Moral Rights." Employee hereby waives and agrees never to assert any "Moral Rights" that he/she might have in or with respect to any Invention and/or Intellectual Property during or after his/her employment with Company. "Moral Rights" means any right (or similar right existing under the judicial or statutory law of any country or treaty) to claim authorship of or rights to any Invention or Intellectual Property, to object or prevent modification of any Invention or Intellectual Property, or to withdraw from circulation or to control the publication or distribution of any Invention or Intellectual Property.

5.3    Restrictive Covenants.

(a)      *No-Solicitation*.  In order to protect and preserve Company's Confidential Materials, and Company's significant investment in developing its business, which investment Employee hereby acknowledges, commencing as of the date hereof and for a period of two (2) years following cessation of Employee's employment with Company (the "Limited Period") Employee shall not, directly or indirectly, separately or in association with others, interfere, disrupt or damage Company's business by soliciting, recruiting, attempting to recruit, or causing or assisting in the recruitment or attempted recruitment of, any then-current employee of Company, or any individual who has served in any such capacity at any time within the twelve (12) month period immediately prior thereto, for employment with another person or entity.

(b)      *No-Hire*.  In order to protect and preserve Company's Confidential Materials, and Company's significant investment in developing its business, which investment Employee hereby acknowledges, unless prohibited by applicable law, during the Limited Period, Employee shall not, directly or indirectly, hire, attempt to hire, or cause or assist in the hiring or attempted hiring of, any then-current employee, consultant or exclusive independent contractor of Company, or any individual who has served in any such capacity at any time within the twelve (12) month period immediately prior thereto, for employment.

(c)      *Solicitation and Re-Solicitation of Borrowers*.

(i)      Employee agrees that (a) Company expends considerable time, money and resources to market to customers, to generate inquiries into Company's loan programs, to develop confidential methodologies to generate consumer interest in Company's loan programs, to maintain ongoing relationships with its customers, to develop and maintain business relationships with referral sources, and to acquire, compile and develop confidential and proprietary customer lists; (b) Company has a legitimate business interest in maintaining relationships and goodwill with current and prospective customers and referral sources and not having those relationships and goodwill unfairly interfered with; and (c) the relationships between Company and its past, present, and future customers, prospects and referral sources, and all rights therein, are and shall remain the sole and exclusive property of Company. Any referral source established by Employee during the term of this Agreement shall be the sole and exclusive property of Company.  Employee also hereby expressly acknowledges that the solicitation of, or the origination of a loan for, a consumer for whom a loan previously was processed and closed by Company may result in the imposition against Company of fines, penalties, reimbursements, indemnifications, damages and expenses ("Re-Solicitation Losses").

(ii)      Employee shall under no circumstances solicit, and Employee shall cause the Branch Employees to refrain from soliciting, any consumer for whom a loan previously was processed and closed by Company during the longer of (a) the two (2) year period following the date of such loan closing, and (b) such period as may be specified in the Applicable Requirements of the pertinent lender or investor with respect to the loan, if such solicitation or loan closing would result in a Re-Solicitation Loss to Company.  More generally, Employee shall not during the term of employment and for a period of two (2) years after his/her termination, resignation, or separation of his/her employment relationship with Company for whatever reason, directly or indirectly (whether on Employee's own behalf, working with others, or on behalf of any other person, business or entity): contact, call on or otherwise solicit or communicate with in any way any of Company's past, present or future customers, prospective customers and referral sources with the intention or effect of encouraging such customer, prospective customer or referral source to terminate or reduce the volume of its business with Company or to place any portion of such business elsewhere or otherwise interfere with Company's business.

(iii)      Unless otherwise prohibited by applicable law, in the event of any breach of this Section, loans subject to any Re-Solicitation Losses would not be considered an Eligible Loan as defined in Exhibit A and would be subject to Section "**Advanced Amounts, Early Pay Offs & Early Payment Defaults**" of Exhibit A.  Employee further agrees that a violation of this Section, Solicitation and Re-Solicitation of Borrowers, constitutes improper interference with Company's legitimate, actual and prospective business expectations and contractual relations with its customers, prospects and referral sources; constitutes a misappropriation of Company's goodwill; and unfairly and unjustifiably harms Company. Accordingly, Employee agrees that: (a) the damages for improper interference, lost business opportunities, lost goodwill or lost clientele are uncertain and difficult to ascertain and that Company may be required to pay a recapture fee or similar fee to outside investors in the event a customer is refinanced by another lending institution within one (1) year (or longer) of closing a loan with Company; (b) in the event that Employee, directly or indirectly, (on his/her own behalf, working with others, or on behalf of another person, business or entity) solicits or conducts any transactions or business in violation of this Section, Solicitation and Re-Solicitation of Borrowers, then Employee promises, agrees and covenants to pay to Company all revenues that Company would have derived from the origination, funding and sale of the loan for each loan solicited or originated in violation of this Agreement, plus any applicable recapture fee or similar fee paid by Company to its outside investors.  Employee agrees that the amount stated in this Section, Solicitation and Re-Solicitation of Borrowers, is the agreed upon reasonable compensation and damages due to Company for such a breach, lost business opportunities,

recapture fees incurred by Company, and lost goodwill and clientele, and that the stated amount is not a penalty and shall be due and payable by Employee to Company upon demand.  It is the Employee's affirmative obligation to determine whether any person with whom he/she (or any person or company/business by whom Employee is employed) has contact is a customer, prospective customer or referral source of Company.  In any proceeding to enforce this Agreement, there shall be a legal presumption that any mortgage related product of service provided to any of Company's past, present or future customers, prospects or referral sources by the Employee (or by any other person or company/business by whom Employee is employed) was undertaken and performed in violation of this Agreement.

5.4     Independent Covenants.  All covenants and provisions contained in this Article "**Protected Information and Restrictive Covenants**" are independent of each other and may be separately enforced or enforced together.  If any of the covenants set forth in this Article "**Protected Information and Restrictive Covenants**" is determined to be unenforceable because of its scope, duration, geographical area or similar factor, then the court making such determination shall have the power to reduce or limit such scope, duration, area or other factor, and such covenant shall then be enforceable in its reduced or limited form.

5.5     Irreparable Harm; Injunctive Relief.  Company and Employee recognize and acknowledge that in the event of any breach of any provision of this Article, irreparable harm will be suffered by Company and that any remedy available at law will be inadequate and Company and Employee do, therefore, agree that in such event Company shall be entitled to injunctive relief in any court of competent jurisdiction against Employee and against any other person or entity involved in or connected with such breach, without necessity of posting any bond, cash or security against/for Employee or any individual or entity involved in or connected with such breach, which rights shall be in addition to such rights as Company may have for damages and in addition to such other remedies as the law or equity may provide.  In addition to these remedies, damages resulting from the solicitation or employment of persons in violation of this Agreement are uncertain and difficult to ascertain and, accordingly, the Parties agree that Employee shall pay Company $9,250.00 for each person employed in violation of this Agreement, which is the agreed-upon and reasonable reimbursement and payment for the recruiting, interviewing, hiring and training of a replacement employee and for the loss of revenue and burden on Company resulting from the loss of revenue, goodwill, and the solicited employee, and is not a penalty. In any proceedings to enforce this Agreement, there shall be a legal presumption that the employment of any employee or former employee of Company by Employee or the business with whom Employee is employed within the time periods set forth in this Agreement resulted from conduct in violation of this Agreement.  The amount stated as the agreed upon damages in this Section shall not diminish Company's ability to seek other additional relief as provided for in this Agreement or otherwise provided by law and is not a waiver of any agreements between Company and the employee or former employee employed in violation of this Agreement.

## ARTICLE VI
## MISCELLANEOUS PROVISIONS

6.1     Severability.  The invalidity or unenforceability of any term or provision contained in this Agreement shall not void or impair the remaining provisions hereof, which shall remain in full force and effect as if such invalid or unenforceable provision had never been contained herein.

6.2     Modifications, Alterations and Amendments.  Company reserves the right to modify, alter or amend this Agreement prospectively upon written notice to Employee.  Such modifications shall not affect commissions earned but not paid.  Employee's continued employment after written notice of the modification, alteration or amendment shall constitute Employee's acceptance of the modification, alteration or amendment.   No modification, alteration or amendment of Employee's at-will status is effective, however, unless it is in writing and signed by Employee and an officer of Company.

6.3     Further Assurances.  Employee agrees to execute, acknowledge and deliver or cause to be executed, acknowledged and delivered all such further documents that Company reasonably deems necessary or appropriate to carry out the terms and provisions of this Agreement.

6.4     No Waiver.  No waiver by Company of any condition, or the breach of any term, covenant, representation or warranty contained herein, whether by conduct or otherwise, by Employee in any one or more instances shall be deemed or construed as a further or continuing waiver of any such term, condition, representation or warranty set forth in the Agreement.  Any waiver must be in writing in order to be enforceable against Company.

6.5     Successors and Assigns.  Company may assign its rights and duties hereunder provided that the assignee is the successor, by operation of law or otherwise, to the business of Company.  Employee's rights and obligations under this Agreement shall not be assignable absent Company's prior written consent, which Company may withhold in its sole and absolute discretion.

6.6     Enforcement. Employee agrees that (a) the promises, obligations and covenants undertaken under this Agreement have been agreed to freely, voluntarily and without duress as a reasonable condition precedent to employment and continued employment with Company and that they do not impose undue hardship on Employee; and (b) any violation or breach of Employee's post-employment obligations set forth herein will result in irreparable injury to Company for which no adequate remedy at law may be available.  Employee consents to the issuance of a temporary restraining order and injunction prohibiting any conduct by Employee in violation of this Agreement without the requirement of posting a bond, the same being waived by Employee.  The seeking of such injunctive relief shall not affect Company's right to seek and obtain damages or other equitable relief on account of any such actual or threatened breach.

(a)     Should any post-employment obligation as set forth herein be deemed by a Court of competent jurisdiction to be too broad to permit enforcement to its full extent, thence such post-employment obligation shall be enforced to the maximum extent permitted by law. Company and Employee each hereby consent and agree that such scope may be judicially modified accordingly in any proceeding brought to enforce such provisions of this Agreement.

(b)     Without limiting Company's rights or remedies under this Agreement or applicable law, if Employee breaches any of his/her post employment covenants or obligations to the Company, then all obligations of Company to Employee shall be terminated and Company shall be entitled to recover from Employee all costs and expenses, including reasonable attorney's fees, in connection with the enforcement, by suit or otherwise, of Company's rights hereunder or under applicable law.   Employee's post-employment covenants and obligations to Company as set forth in this Agreement shall survive Employee's termination.

6.7     Governing Law.   To the maximum extent permitted under applicable law, this Agreement shall be governed by and construed in accordance with the substantive laws of Federal law and the laws of the State of Ohio, without regard to provisions related to choice of law or forum.

6.8     Survival.   Notwithstanding anything herein to the contrary, Sections "Certain Restrictions and Requirements", "Company Property", "Compensation at End of Employment" and "Withholding", and Articles "**Protected Information and Restrictive Covenants**" and "**Miscellaneous Provisions**" shall survive termination of this Agreement and/or termination or resignation of Employee's employment with Company.

6.9     Notice.   Any and all notices, demands or requests required or permitted to be given under this Agreement shall be given in writing and sent, by registered or certified U.S. mail, return receipt requested, by hand, or by overnight courier, addressed to the other Party hereto at its address set forth below, or such other address as such Party may from time-to-time designate by written notice, given in accordance with the terms of this Section.

If to Company:
CrossCountry Mortgage, LLC
Attention: Ronald J. Leonhardt, Jr., President
6850 Miller Road
Brecksville, Ohio 44141

If to Employee, to the address provided on his/her application.

Unless otherwise specified in this Agreement, notice shall be deemed effective:  (a) on the date hand delivered, (b) on the first business day following the sending thereof by overnight courier, and (c) on the fifth calendar day (or, if it is not a business day, then the next succeeding business day thereafter) after the depositing thereof into the exclusive custody of the U.S. Postal Service, except for a notice of change of address, which shall be deemed effective only upon receipt.

6.10     Construction.   In the event of an ambiguity or if a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.  The Section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

6.11     No Third-Party Beneficiaries.   This Agreement is not intended, and shall not be deemed, to confer upon or give rights to any person except as otherwise expressly provided herein.

6.12     Counterparts.   This Agreement may be executed in any number of counterparts, and each such counterpart shall be deemed an original instrument.

6.13    Entire Agreement.  This Agreement sets forth all the promises, covenants, agreements and conditions between the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions, expressed or implied, oral, written or otherwise, except as set forth herein.

6.14    Cooperation.  At all times during and after separation of employment, the Parties hereto shall cooperate in effecting an orderly transition of the business contemplated by this Agreement to avoid any interruption in the handling of the business contemplated by this Agreement.

6.15    Disclosure.  Employee will fully disclose the terms of this Agreement to any entity or person prior to entering into any business relationship of any kind whatsoever with such entity or person.

6.16    Consultation.  Employee agrees and acknowledges that, prior to signing, Company has granted Employee sufficient time to review the Agreement, including allowing Employee (in Employee's sole discretion) to take the Agreement home for further study and review.  Company has encouraged Employee to freely discuss the terms of this Agreement with any lawyer of Employee's choosing prior to signing.

6.17    No Reliance.  Employee is not resigning Employee's employment or relocating a residence in reliance on any promise or representation by Company regarding any guaranteed length of employment or guaranteed compensation by Company.

6.18    Incorporation.  The attachments identified in this Agreement constitute a part of this Agreement and are hereby expressly and specifically incorporated herein by reference in their entirety as if fully set forth in this Agreement.

Arbitration; Jury Waiver; Collective Action Waiver.  As a condition of employment, Employee agrees and acknowledges that Company and Employee will utilize binding arbitration to resolve all disputes arising out of or relating to Employee's employment with Company.  Both Company and Employee mutually agree that any claim, dispute and/or controversy that either Employee may have against Company (or its owners, directors, officers, managers, employees, and agents) or Company may have against Employee, arising from, related to, or having any relationship or connection whatsoever with Employee seeking employment with, employment by, or other association with Company, shall be submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act ("FAA").  Included within the scope of this Arbitration Agreement are all disputes, whether based in tort, contract, statute, equitable law, or otherwise.

Excluded from this Arbitration Agreement are claims that are not arbitrable pursuant to federal or state law including workers' compensation claims, unemployment compensation claims, or the right to file an administrative charge before a governmental agency, such as the Equal Employment Opportunity Commission (EEOC), National Labor Relations Board (NLRB), or the Department of Labor (DOL), or other claims that as a matter of law cannot be subject to arbitration.  For purposes of this provision the following matters may not be subject to arbitration: (i) matters relating to enforcement of the provisions under the Article titled **"Protected Information and Restrictive Covenants"**, which Company may seek to enforce in any court of competent jurisdiction; and (ii) joinder by Company of Employee as a third party defendant in any suit brought against Company.

The following conditions are mutually agreed upon by both parties to this Arbitration Agreement:
   (a) Any relief that would otherwise be available in a court action is equally available to the parties in connection with the arbitration proceedings;
   (b) In addition to any other requirements imposed by law, disputes shall be settled by binding arbitration administered by the American Arbitration Association ("AAA") before a qualified individual, to whom the parties may mutually agree pursuant to AAA's Employment Arbitration Rules and Mediation Procedures (found at https://www.adr.org), and shall be subject to disqualification on the same grounds as would apply to a judge of such court;
   (c) The procedures of the arbitration shall be governed by the Ohio Code of Civil Procedure and Ohio Rules of Court. To the extent permissible under applicable law, any and all hearings or other proceedings shall be held at a place in Cuyahoga County, Ohio;
   (d) The Arbitrator shall have the authority to allow for appropriate discovery and exchange of information before a hearing, including, but not limited to: interrogatories, requests for production of documents, requests for admission, depositions, and the issuance of subpoenas.  The parties shall be permitted enough discovery to gather necessary evidence to prove their claims or defenses;
   (e) Awards shall include the Arbitrator's written and well-reasoned opinion(s).  The Arbitrator shall issue a written opinion and award, in conformance with the following requirements: (i) the opinion and award must be signed and dated by the Arbitrator; (ii) the Arbitrator's opinion(s) and award shall decide all issues submitted; (iii) the Arbitrator's opinion and award shall set forth the legal principals supporting each part of the opinion(s);

and (iv) the Arbitrator shall have the same authority to award remedies and damages as provided to a judge and/or jury under parallel circumstances in a civil action;

(f) Company shall pay the costs associated with the arbitration, except for those costs which the employee would routinely be required to pay in court litigation.  If Employee works or resides in the state of California, costs paid by Company shall include the amount of any arbitration filing fees in excess of filing fees that would be imposed if Employee filed the same claim(s) in a court or administrative body of competent jurisdiction.  To the extent permissible under applicable law, each party shall be responsible for its own attorneys' fees, except that the Arbitrator may award attorneys' fees to the prevailing party consistent with applicable state or federal law;

(g) Judgment upon the award rendered by the Arbitrator may be entered as a judgment in any court having jurisdiction thereof; and

**(h) COMPANY AND EMPLOYEE AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN AN INDIVIDUAL CAPACITY AND NOT AS A PLAINTIFF OR CLASS REPRESENTATIVE/MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.**

This Arbitration Agreement shall survive termination of Employee's employment with Company.  The parties may only revoke or modify this Arbitration Agreement with a written instrument, demonstrating the unambiguous, mutual intent of the parties, signed by Employee and the President/Owner(s) of Company. If a court or administrative body of competent jurisdiction deems any term or provision of this Arbitration Agreement illegal, otherwise invalid, or incapable of being enforced to any extent, such term or provision shall be severed to the extent of such invalidity or unenforceability; all other terms hereof shall remain in full force and effect; and, to the extent permitted and possible, Employee and Company agree that the body making the determination of invalidity or unenforceability shall have the power to replace the invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and that this Arbitration Agreement shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

Employee understands and agrees that both Employee and Company give up the right to trial by jury of any claim each may have against the other.  Employee understands that the AAA's filing fees are typically more expensive than the filing fees in a court of law.  Further, the AAA may interpret and enforce the rules of procedure and evidence in a different manner than a court of law or administrative body.  For a full set of the AAA's rules and more information on the AAA's arbitration process, please visit www.adr.org.  Employee's signature below indicates Employee's agreement to the alternative dispute resolution processes described herein.

**EMPLOYEE'S SIGNATURE BELOW CERTIFIES THAT EMPLOYEE HAS READ, UNDERSTANDS, AND AGREES TO BE LEGALLY BOUND TO ALL OF THE ABOVE TERMS. EMPLOYEE'S SIGNATURE ALSO CERTIFIES THAT COMPANY HAS PROVIDED EMPLOYEE THE OPPORTUNITY TO REVIEW THIS AGREEMENT WITH LEGAL COUNSEL OF EMPLOYEE'S CHOICE AND EMPLOYEE HAS CONSULTED WITH COUNSEL OR, ALTERNATIVELY, EMPLOYEE HAS WILLINGLY WAIVED SUCH OPPORTUNITY.**

**DO NOT SIGN UNTIL YOU HAVE READ THE ABOVE AGREEMENT AND ACKNOWLEDGMENT.**

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the Parties hereto have caused their names to be hereunto subscribed, all as of the day and year first above written.

**EMPLOYEE**

Christopher J Gallo

**CROSSCOUNTRY MORTGAGE, LLC**

By:      Alex Ragon
Its:      Chief Legal Counsel

# CROSSCOUNTRY MORTGAGE™

**EXHIBIT A**
**ORIGINATING BRANCH MANAGER COMPENSATION**
**BRANCH # 4150**

Employee's compensation shall be determined and calculated in accordance with this Exhibit A. Notwithstanding anything to the contrary herein, the timing of payments of compensation shall at all times be subject to Company Policies regarding payroll practices in effect from time to time, and Company may, in its sole and absolute discretion, change the compensation rates and formulas set forth in this Exhibit A, and the manner and schedule of payment, at any time on a prospective basis, but no such change will affect any compensation already earned by Employee as of the date the change is announced.

**I.    Employee Compensation.**

Employee Name: _____ Christopher J Gallo _____

For each pay period, Employee shall earn (a) a guaranteed salary and (b) a commission amount.

**A) Salary.** Employee shall be paid an annual "Salary" equal to **$35,568**

☐   Check this box if Salary is Draw against Commission

**B) Commission Amount.** For each Eligible Loan (as defined below) originated by Employee as the licensed Loan Officer or originated by the Employee's branch location, the Employee and branch being duly licensed to conduct business within the jurisdiction in which the property securing the loan is located, Employee shall be paid a commission as defined below, less all applicable taxes and withholdings.

Employee will be paid the following BPS of the principal amount of the credit extended for each Eligible Loan, personally originated, that is classified as follows:

| | |
|---|---|
| Self-Generated Lead: | 75 BPS |
| Branch-Generated Lead: | 50 BPS |
| Brokered (Cannot be underwritten and funded by Company): | 60 BPS |
| Current Customer: | 25 BPS |

For purposes of compensation based on lead source, the Company lead source form must be completed by the Employee at the time of application and uploaded to Encompass.  The lead source form will identify the lead source (self, branch or MSA).  The lead source may NOT be changed or amended at any time.

For purposes of compensation based on the Company's ability to underwrite and fund the loan, the compensation ONLY applies to loans that the Company cannot either underwrite or fund.  The factor is not whether it was or was not underwritten or funded by the Company, but whether it could have been either underwritten or funded by the Company.

There also is to be a minimum commission dollar amount per loan of $ N/A and a maximum commission dollar amount per loan of $ N/A.

If the Employee's Base Pay is a draw against commission, then the commissions here are subject to a reduction for the amount of Base Pay identified under Section "**Salary**" of this Exhibit payable during the pay period the loan was closed, as well as a reduction for any amounts previously paid as Base Pay that has not already been taken into account by a prior calculation.

**II.    Advanced Amounts, Early Pay Offs & Early Payment Defaults.** Employee is only considered to have earned and be entitled to payment of Commission or Override Amounts on Eligible Loans. If an originated loan that has closed and been funded becomes subject to an Early Pay Off or Early Payment Default, the loan is not an Eligible Loan under this Agreement, and Employee is not entitled to a Commission or an Override Amount on such loan. Notwithstanding the foregoing, Company may advance Commission and Override Amounts for all Eligible Loans

13

that meet (a), (b) and (c) of the Eligible Loan definition, as applicable, in the next payment cycle. If the Commission or Override Amount has been advanced on a loan that later results in an Early Pay Off or Early Payment Default, Employee shall owe Company the amount advanced to the Employee on such ineligible loan. In such case, subject to applicable law, (a) if Employee is still employed by Company, Company will reduce the amount of any such unearned advancement from the next Commission or Override Amount payment to Employee; or (b) if Employee is no longer employed by Company, Employee shall reimburse Company the amount of any such unearned advancement in cash or by check within 30 days of Company's notification to Employee of the amount due. Notwithstanding the foregoing, in no case will Employee receive less than the applicable minimum wage for any hours worked in each workweek during the employment period.

**III.   Definitions** As used herein:

"Basis Point" is equal to one hundredth of one percentage point (0.01%) of the gross loan amount stated in the Note at settlement.

An "Early Payment Default" occurs when a loan becomes past due as defined by the guidelines set by the investor that purchased the loan.

An "Early Pay Off" occurs when a loan is repaid in full, for any reason, within the time frame set by the investor that purchased the loan.

An "Eligible Loan" is defined as a residential mortgage loan (a) that is originated in accordance with Applicable Requirements; (b) that is closed and funded in accordance with Applicable Requirements, in the period in which the Commission is calculated; (c) that is not unfunded, cancelled or rescinded for any reason within three (3) business days after settlement; and (d) for which the period for any Early Payment Default and Early Pay Off has expired.

*Employee acknowledges and agrees that at the date of his/her termination, resignation, or separation of employment from Company, for any reason, voluntarily or involuntarily, to be eligible for compensation hereunder, the Eligible Loan must be closed and funded prior to the date of termination, resignation, or separation.*

"Originate" means, without limitation, at the combination of at least the following activities with respect to a particular loan: [soliciting the potential applicant for a mortgage loan; taking information from the applicant and filling out the application; educating the applicant in the home buying and financing process; advising the applicant about different types of loan products available, and demonstrating how closing costs and monthly payments would vary under each product; collecting financial information (such as tax returns and bank statements) and other related documents that are part of the application process; assisting the applicant in understanding and clearing credit problems; maintaining regular contact with the applicant, real estate broker/agent and Company during the time between application and closing to apprise each of the status of the application and to gather additional information as needed; ordering requests for mortgage and other loan verifications; providing the applicant with appropriate disclosures (such as truth in lending disclosures and good faith estimates); participating in the loan closing; and performing such other acts that are reasonably related or necessary to the above-mentioned activities, or as required by Applicable Requirements.]

**IV.   Periodic Reviews.** Company will evaluate no more than quarterly the commission amounts paid to its loan originators based on factors such as loan performance, transaction volume, and current market conditions, and prospectively revise the compensation it agrees to pay to Employee. Company shall have the right, at its sole discretion, to modify this compensation schedule (Exhibit A), in whole or in part, at any time on a prospective (but not a retroactive) basis. In such event, Company shall issue and deliver to Employee a new Exhibit A which reflects such changes which shall, as of the effective date stated thereon, supersede and replace the prior Exhibit A. Upon modification of this Exhibit A, the calculations herein will apply to all transactions with a locked rate that is prior to the effective date of such modification.

Employee and Company hereby agree to Employee's compensation as set forth in this Exhibit A, which shall be effective as of **DATE OF HIRE**.

**EMPLOYEE INFORMATION**

_Christopher J Gallo_ (signature)

Christopher J Gallo

September 1, 2023

Date

**DocuSign**

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: C99E119A6E8540F7BDDE5A439C76E57E | | Status: Completed |
| Subject: Complete with DocuSign: Gallo, Christopher J COMP AGREE.docx | | |
| Source Envelope: | | |
| Document Pages: 14 | Signatures: 3 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 0 | Abigail Singh |
| AutoNav: Enabled | | 6850 miller road |
| EnvelopeId Stamping: Enabled | | Brecksville, OH  44141 |
| Time Zone: (UTC-05:00) Eastern Time (US & Canada) | | abigail.singh@ccm.com |
| | | IP Address: 50.173.129.34 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Abigail Singh | Location: DocuSign |
|     8/23/2023 1:57:30 PM |     abigail.singh@ccm.com | |

## Signer Events

| Signer Events | Signature | Timestamp |
|---|---|---|
| Christopher J Gallo<br>cjgallo@gmail.com<br>Branch Manager<br>Security Level: Email, Account Authentication (None) | *Christopher J Gallo*<br>9254F1D0C9DC49C... | Sent: 8/23/2023 1:59:32 PM<br>Viewed: 8/23/2023 1:59:54 PM<br>Signed: 9/1/2023 9:11:47 AM |
| | Signature Adoption: Pre-selected Style<br>Using IP Address: 108.35.43.28 | |
| **Electronic Record and Signature Disclosure:**<br>   Accepted: 7/24/2023 4:54:29 PM<br>   ID: dcc3c62b-a1a6-48e2-9314-44664fdfdf0a | | |
| Alex Ragon<br>aragon@myccmortgage.com<br>Chief Legal Counsel<br>CrossCountry Mortgage Inc<br>Security Level: Email, Account Authentication (None) | *Alex Ragon*<br>A407916AAB2E4CB... | Sent: 9/1/2023 9:11:49 AM<br>Viewed: 9/5/2023 9:35:07 AM<br>Signed: 9/5/2023 9:35:11 AM |
| | Signature Adoption: Pre-selected Style<br>Using IP Address: 50.173.129.34 | |
| **Electronic Record and Signature Disclosure:**<br>   Not Offered via DocuSign | | |

## In Person Signer Events

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

## Editor Delivery Events

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

## Agent Delivery Events

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

## Intermediary Delivery Events

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

## Certified Delivery Events

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

## Carbon Copy Events

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Abigail Singh<br>abigail.singh@ccm.com<br>CrossCountry Mortgage, LLC<br>Security Level: Email, Account Authentication (None) | **COPIED** | Sent: 9/5/2023 9:35:12 AM |
| **Electronic Record and Signature Disclosure:**<br>   Not Offered via DocuSign | | |

## Witness Events

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 8/23/2023 1:59:32 PM |
| Certified Delivered | Security Checked | 9/5/2023 9:35:07 AM |
| Signing Complete | Security Checked | 9/5/2023 9:35:11 AM |
| Completed | Security Checked | 9/5/2023 9:35:12 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

**ELECTRONIC RECORD AND SIGNATURE DISCLOSURE**

From time to time, CrossCountry Mortgage Inc (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through your DocuSign, Inc. (DocuSign) Express user account. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. For such copies, as long as you are an authorized user of the DocuSign system you will have the ability to download and print any documents we send to you through your DocuSign user account for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of your DocuSign account. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use your DocuSign Express user account to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through your DocuSign user account all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact CrossCountry Mortgage Inc:**
You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
 To contact us by email send messages to us: cscalise@myccmortgage.com

**To advise CrossCountry Mortgage Inc of your new e-mail address**
To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at cscalise@myccmortgage.com and in the body of such request you must state: your previous e-mail address, your new e-mail address.  We do not require any other information from you to change your email address..
In addition, you must notify DocuSign, Inc to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in DocuSign.

**To request paper copies from CrossCountry Mortgage Inc**
To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to cscalise@myccmortgage.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with CrossCountry Mortgage Inc**
To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

>i. decline to sign a document from within your DocuSign account, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
>ii. send us an e-mail to cscalise@myccmortgage.com and in the body of such request you must state your e-mail, full name, IS Postal Address, telephone number, and account number. We do not need any other information from you to withdraw consent..  The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

| Operating Systems: | Windows2000? or WindowsXP? |
|---|---|
| Browsers (for SENDERS): | Internet Explorer 6.0? or above |
| Browsers (for SIGNERS): | Internet Explorer 6.0?, Mozilla FireFox 1.0, NetScape 7.2 (or above) |
| Email: | Access to a valid email account |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | •Allow per session cookies<br><br>•Users accessing the internet behind a Proxy Server must enable HTTP 1.1 settings via proxy connection |

\*\* These minimum requirements are subject to change. If these requirements change, we will provide you with an email message at the email address we have on file for you at that time providing you with the revised hardware and software requirements, at which time you will have the right to withdraw your consent.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I Agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify CrossCountry Mortgage Inc as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by  CrossCountry Mortgage Inc during the course of my relationship with you.

**Subject**
Complete with DocuSign: Gallo,
Christopher J COMP AGREE.docx

**Document**
Gallo, Christopher J COMP AGREE.docx

**Document Id**
c99e119a-6e85-40f7-bdde-
5a439c76e57e

**Recipients**
Christopher J Gallo, Alex Ragon, Abigail
Singh

**Date Sent**
8/23/2023 | 01:59:32 pm

**Date Created**
8/23/2023 | 01:57:30 pm

**Status Date**
9/5/2023 | 09:35:14 am

**Location**
Online

**Holder**
Abigail Singh

**Time Zone**

Page 1 of 4

| Time | User | Action | Activity | Status |
|------|------|--------|----------|--------|
| 8/23/2023 \| 01:57:30 pm | Abigail Singh | Registered | The envelope was created by Abigail Singh | Created |
| 8/23/2023 \| 01:59:32 pm | Abigail Singh | Sent Invitations | Abigail Singh sent an invitation to Christopher J Gallo [cjgallo@gmail.com] | Sent |
| 8/23/2023 \| 01:59:48 pm | Christopher J Gallo | Opened | Christopher J Gallo opened the envelope [documents:(Gallo, Christopher J COMP AGREE.docx)] | Sent |
| 8/23/2023 \| 01:59:54 pm | Christopher J Gallo | Viewed | Christopher J Gallo viewed the envelope [documents:(Gallo, Christopher J COMP AGREE.docx)] | Sent |
| 9/1/2023 \| 09:09:52 am | Email URL | Resent Expired Link | New link requested for email sent to cjgallo@gmail.com | Sent |
| 9/1/2023 \| 09:10:09 am | Christopher J Gallo | Opened | Christopher J Gallo opened the envelope [documents:(Gallo, Christopher J COMP AGREE.docx)] | Sent |
| 9/1/2023 \| 09:10:28 am | Christopher J Gallo | Viewed | Christopher J Gallo viewed the envelope [documents:(Gallo, Christopher J COMP AGREE.docx)] | Sent |
| 9/1/2023 \| 09:11:47 am | Christopher J Gallo | Signed | Christopher J Gallo signed the envelope | Sent |
| 9/1/2023 \| 09:11:49 am | Abigail Singh | Sent Invitations | Abigail Singh sent an invitation to Alex Ragon [aragon@myccmortgage.com] | Sent |
| 9/5/2023 \| 09:35:02 am | Alex Ragon | Opened | Alex Ragon opened the envelope [documents:(Gallo, Christopher J COMP AGREE.docx)] | Sent |

| Language | IP | Source |
|---|---|---|
| English (us) | 50.173.129.34 | api |
| English (us) | 50.173.129.34 | api |
| English (us) | 108.35.43.28 | web |
| En | 108.35.43.28 | web |
| English (us) | 108.35.43.28 | web |
| English (us) | 108.35.43.28 | web |
| En | 108.35.43.28 | web |
| En | 108.35.43.28 | web |
| En | 108.35.43.28 | web |
| English (us) | 50.173.129.34 | web |

| Time | User | Action | Activity | Status |
|------|------|--------|----------|--------|
| 9/5/2023 \| 09:35:07 am | Alex Ragon | Viewed In-Session | Alex Ragon viewed the envelope in a session hosted by CrossCountry Mortgage, LLC [documents:(Gallo, Christopher J COMP AGREE.docx)] | Sent |
| 9/5/2023 \| 09:35:11 am | Alex Ragon | Signed | Alex Ragon signed the envelope | Sent |
| 9/5/2023 \| 09:35:13 am | Abigail Singh | Printable Copy Attached to Email | Abigail Singh was sent the document (Gallo, Christopher J COMP AGREE.docx.pdf) attached to the completed email | Completed |
| 9/5/2023 \| 09:35:13 am | Abigail Singh | Printable Copy Attached to Email | Abigail Singh was sent the document (Summary.pdf) attached to the completed email | Completed |
| 9/5/2023 \| 09:35:13 am | Christopher J Gallo | Printable Copy Attached to Email | Christopher J Gallo was sent the document (Gallo, Christopher J COMP AGREE.docx.pdf) attached to the completed email | Completed |
| 9/5/2023 \| 09:35:13 am | Christopher J Gallo | Printable Copy Attached to Email | Christopher J Gallo was sent the document (Summary.pdf) attached to the completed email | Completed |
| 9/5/2023 \| 09:35:14 am | Alex Ragon | Printable Copy Attached to Email | Alex Ragon was sent the document (Gallo, Christopher J COMP AGREE.docx.pdf) attached to the completed email | Completed |
| 9/5/2023 \| 09:35:14 am | Alex Ragon | Printable Copy Attached to Email | Alex Ragon was sent the document (Summary.pdf) attached to the completed email | Completed |

| Language | IP | Source |
|----------|-----|--------|
| En | 50.173.129.34 | web |
| En | 50.173.129.34 | web |
| En | 50.173.129.34 | web |
| En | 50.173.129.34 | web |
| En | 50.173.129.34 | web |
| En | 50.173.129.34 | web |
| En | 50.173.129.34 | web |
| En | 50.173.129.34 | web |



# BONUS AGREEMENT

This Bonus Agreement ("Agreement") is entered into on <u>September 5, 2023</u> by and between **CrossCountry Mortgage, LLC**, a Delaware limited liability company ("Company") and **CHRISTOPHER GALLO** ("Employee") (collectively, the "Parties").

## RECITALS

**WHEREAS,** Company desires to bestow upon the Employee a bonus in consideration for Employee's continued employment with the Company and remaining satisfactorily employed for the period of time stated herein.

**NOW, THEREFORE,** in consideration thereof and of the covenants hereafter set forth, the Parties hereby agree as follows:

1.    **INCORPORATION OF RECITALS.** The above recitals are incorporated herein by this reference.

2.    **SIGN-ON BONUS PAYMENT.** Company agrees to pay Employee a bonus in the sum of <u>Two Million One Hundred Thousand Dollars</u> ($2,100,000.00) (the "Bonus"). Company will pay the Bonus through its regular payroll, as follows:

☐    In one (1) payment within thirty days after Employee's first day of employment with Company

☒    In six (6) equal installments the first installment of which paid within thirty days after Employee's first day of employment with Company and the remaining five installments paid every payroll period thereafter until paid in full.

The Bonus shall be subject to all required taxes and withholdings applicable to bonuses.

The Parties agree that the Bonus is a recoverable bonus. To earn the Bonus, Employee must remain continuously employed with Company for thirty six (36) months starting on the Employee's first day of employment with Company (the "Vesting Period"). If Employee does not remain continuously employed with Company for the full Vesting Period, Employee must return the Bonus in full to Company, as set forth in Paragraph 3.

3.    **RETURN OF BONUS.** If the employment relationship between Employee and Company is terminated, either voluntarily or involuntarily, prior to the expiration of the Vesting Period, then Employee must return the entire Bonus to Company within ten (10) days of the termination date. If Employee does not return the Bonus pursuant to this Paragraph, the outstanding amount is delinquent and immediately collectible following the tenth (10th) day after the termination date. Time of employment less than the full Vesting Period, including partial months of employment, does not reduce Employee's obligation to return the entire Bonus, under this Agreement.

4. **FURTHER DOCUMENTS.** The Parties agree to execute any and all documents, and to perform any and all other acts, reasonably necessary to accomplish the purposes of this Agreement.

5. **AT WILL EMPLOYMENT.** Nothing in this Agreement guarantees employment for any period of time. Employee shall be and remain an employee "at will".

6. **ACKNOWLEDGEMENTS.** Employee understands s/he has the right to discuss this Agreement with any individual and, to the extent desired, Employee has taken advantage of this opportunity. Employee further acknowledges that s/he has carefully read and fully understands the provisions of this Agreement, and that s/he is voluntarily entering into the Agreement without any duress or pressure from Company. Employee also understands and acknowledges that this Agreement is the entire agreement between Employee and Company with respect to payment and return of the Bonus, and Employee acknowledges that Company has not made any other statements, promises or commitments of any kind (written or oral) to cause Employee to agree to the terms of this Agreement.

7. **WAIVER.** The failure of a party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver nor shall it deprive such party of the right thereafter to insist upon strict adherence to that term or any term of this Agreement. Any waiver must be in writing and signed by the waiving party. If Company is the waiving party, such waiver must be signed by Company's President and Chief Executive Officer, Ronald J. Leonhardt, Jr.

8. **MODIFICATION.** This Agreement may be supplemented, amended, or modified only by the mutual agreement of the Parties. No supplement, amendment, or modification of this Agreement shall be binding unless it is in writing and signed by the Employee and Company's President and Chief Executive Officer or Company's Chief Legal Counsel.

9. **SEVERABILITY.** The Parties agree that should a court of competent jurisdiction declare or determine any provision of this Agreement to be illegal, invalid, or unenforceable, the remainder of the Agreement shall nonetheless remain binding and enforceable and the illegal, invalid or unenforceable provision(s) shall be modified only so much as necessary to comply with applicable law.

10. **CHOICE OF LAW.** This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio (without regard to any conflicts of laws principles thereof that would give effect to the laws of another jurisdiction).

11. **ARBITRATION; JURY WAIVER; COLLECTIVE ACTION WAIVER.** Employee agrees and acknowledges that Company and Employee will utilize binding arbitration to resolve all disputes arising out of or relating to this Agreement. Both Company and Employee mutually agree that any claim, dispute and/or controversy that either Employee may have against Company (or its owners, directors, officers, managers, employees, and agents) or Company may have against Employee, arising from, related to, or having any relationship or connection whatsoever with this Agreement, shall be submitted to and determined exclusively by binding arbitration under the Federal

Arbitration Act ("FAA"). Included within the scope of this Arbitration Agreement are all disputes, whether based in tort, contract, statute, equitable law, or otherwise.

Excluded from this arbitration provision are claims that are not arbitrable pursuant to federal or state law including workers' compensation claims, unemployment compensation claims, or the right to file an administrative charge before a governmental agency, such as the Equal Employment Opportunity Commission (EEOC), National Labor Relations Board (NLRB), or the Department of Labor (DOL), or other claims that as a matter of law cannot be subject to arbitration.

The following conditions are mutually agreed upon by both parties to this arbitration provision:

a) Any relief that would otherwise be available in a court action is equally available to the parties in connection with the arbitration proceedings;

b) In addition to any other requirements imposed by law, disputes shall be settled by binding arbitration administered by the American Arbitration Association ("AAA") before a qualified individual, to whom the parties may mutually agree pursuant to AAA's Employment Arbitration Rules and Mediation Procedures (found at https://www.adr.org), and shall be subject to disqualification on the same grounds as would apply to a judge of such court;

c) The procedures of the arbitration shall be governed by the Ohio Code of Civil Procedure and Ohio Rules of Court. To the extent permissible under applicable law, any and all hearings or other proceedings shall be held at a place in Cuyahoga County, Ohio;

d) The Arbitrator shall have the authority to allow for appropriate discovery and exchange of information before a hearing, including, but not limited to: interrogatories, requests for production of documents, requests for admission, depositions, and the issuance of subpoenas. The parties shall be permitted enough discovery to gather necessary evidence to prove their claims or defenses;

e) Awards shall include the Arbitrator's written and well-reasoned opinion(s). The Arbitrator shall issue a written opinion and award, in conformance with the following requirements: (i) the opinion and award must be signed and dated by the Arbitrator; (ii) the Arbitrator's opinion(s) and award shall decide all issues submitted; (iii) the Arbitrator's opinion and award shall set forth the legal principals supporting each part of the opinion(s); and (iv) the Arbitrator shall have the same authority to award remedies and damages as provided to a judge and/or jury under parallel circumstances in a civil action;

f) Company shall pay the costs associated with the arbitration, except for those costs which the employee would routinely be required to pay in court litigation. To the extent permissible under applicable law, each party shall be responsible for its own attorneys' fees, except that the Arbitrator may award attorneys' fees to the prevailing party consistent with applicable state or federal law;

3

g) Judgment upon the award rendered by the Arbitrator may be entered as a judgment in any court having jurisdiction thereof; and

h) **COMPANY AND EMPLOYEE AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN AN INDIVIDUAL CAPACITY AND NOT AS A PLAINTIFF OR CLASS REPRESENTATIVE/MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.**

This arbitration provision shall survive termination of this Agreement. The parties may only revoke or modify this arbitration provision with a written instrument, demonstrating the unambiguous, mutual intent of the parties, signed by Employee and the President/Owner(s) of Company. If a court or administrative body of competent jurisdiction deems any term of this arbitration provision illegal, otherwise invalid, or incapable of being enforced to any extent, such term or provision shall be severed to the extent of such invalidity or unenforceability; all other terms hereof shall remain in full force and effect; and, to the extent permitted and possible, Employee and Company agree that the body making the determination of invalidity or unenforceability shall have the power to replace the invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and that this arbitration provision shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

Employee understands and agrees that both Employee and Company give up the right to trial by jury of any claim each may have against the other. Employee understands that the AAA's filing fees are typically more expensive than the filing fees in a court of law. Further, the AAA may interpret and enforce the rules of procedure and evidence in a different manner than a court of law or administrative body. For a full set of the AAA's rules and more information on the AAA's arbitration process, please visit www.adr.org. Employee's signature below indicates Employee's agreement to the alternative dispute resolution processes described herein.


**EMPLOYEE**                                     **CROSSCOUNTRY MORTGAGE, LLC**

_Christopher Gallo_                          By: _Alex Ragon_

Christopher Gallo                                Alex J. Ragon, Chief Legal Counsel

**DocuSign**

## Certificate Of Completion

Envelope Id: 11BD8ADB5E7C46E7AAEAEAB005573B72    Status: Completed
Subject: Complete with DocuSign: Gallo, Christopher SIGN ON 9.5.23.docx
Source Envelope:
Document Pages: 4                  Signatures: 2                  Envelope Originator:
Certificate Pages: 5               Initials: 0                    Thea Kjaer
AutoNav: Enabled                                                  6850 miller road
EnvelopeId Stamping: Enabled                                      Brecksville, OH  44141
Time Zone: (UTC-05:00) Eastern Time (US & Canada)                 thea.lutz@myccmortgage.com
                                                                 IP Address: 162.203.35.2

## Record Tracking

Status: Original                   Holder: Thea Kjaer             Location: DocuSign
        8/31/2023 8:44:22 AM               thea.lutz@myccmortgage.com

| Signer Events | Signature | Timestamp |
|---|---|---|
| Christopher Gallo<br>cjgallo@ccm.com<br>Security Level: Email, Account Authentication (None) | *Christopher Gallo*<br>F30117880769..D0..<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 108.35.43.28 | Sent: 8/31/2023 8:46:09 AM<br>Resent: 8/31/2023 2:28:59 PM<br>Resent: 8/31/2023 2:29:04 PM<br>Resent: 9/6/2023 8:44:09 AM<br>Viewed: 9/10/2023 9:11:16 PM<br>Signed: 9/10/2023 9:56:11 PM |
| **Electronic Record and Signature Disclosure:**<br>Accepted: 9/10/2023 9:11:16 PM<br>ID: 747da41b-c709-4ea3-8000-e8d22b558772 | | |
| Alex Ragon<br>aragon@myccmortgage.com<br>Chief Legal Counsel<br>CrossCountry Mortgage Inc<br>Security Level: Email, Account Authentication (None) | *Alex Ragon*<br>A407916AA2E4CB..<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 50.173.129.34 | Sent: 9/10/2023 9:56:12 PM<br>Viewed: 9/12/2023 12:53:49 PM<br>Signed: 9/12/2023 12:53:58 PM |
| **Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Thea Kjaer<br>thea.lutz@myccmortgage.com<br>HR Specialist<br>CrossCountry Mortgage, LLC<br>Security Level: Email, Account Authentication (None) | **COPIED** | Sent: 9/12/2023 12:53:59 PM |
| **Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | | |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 8/31/2023 8:46:09 AM |
| Envelope Updated | Security Checked | 8/31/2023 2:28:58 PM |
| Envelope Updated | Security Checked | 9/6/2023 8:44:05 AM |
| Envelope Updated | Security Checked | 9/6/2023 8:44:05 AM |
| Envelope Updated | Security Checked | 9/6/2023 8:44:05 AM |
| Certified Delivered | Security Checked | 9/12/2023 12:53:49 PM |
| Signing Complete | Security Checked | 9/12/2023 12:53:58 PM |
| Completed | Security Checked | 9/12/2023 12:53:59 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, CrossCountry Mortgage Inc (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through your DocuSign, Inc. (DocuSign) Express user account. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. For such copies, as long as you are an authorized user of the DocuSign system you will have the ability to download and print any documents we send to you through your DocuSign user account for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of your DocuSign account. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use your DocuSign Express user account to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through your DocuSign user account all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact CrossCountry Mortgage Inc:**
You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
 To contact us by email send messages to: cscalise@myccmortgage.com


**To advise CrossCountry Mortgage Inc of your new e-mail address**
To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at cscalise@myccmortgage.com and in the body of such request you must state: your previous e-mail address, your new e-mail address.  We do not require any other information from you to change your email address..
In addition, you must notify DocuSign, Inc to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in DocuSign.

**To request paper copies from CrossCountry Mortgage Inc**
To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to cscalise@myccmortgage.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with CrossCountry Mortgage Inc**
To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

> i. decline to sign a document from within your DocuSign account, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
> ii. send us an e-mail to cscalise@myccmortgage.com and in the body of such request you must state your e-mail, full name, IS Postal Address, telephone number, and account number. We do not need any other information from you to withdraw consent..  The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..


**Required hardware and software**

| Operating Systems: | Windows2000? or WindowsXP? |
|---|---|
| Browsers (for SENDERS): | Internet Explorer 6.0? or above |
| Browsers (for SIGNERS): | Internet Explorer 6.0?, Mozilla FireFox 1.0, NetScape 7.2 (or above) |
| Email: | Access to a valid email account |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | •Allow per session cookies<br><br>•Users accessing the internet behind a Proxy Server must enable HTTP 1.1 settings via proxy connection |

** These minimum requirements are subject to change. If these requirements change, we will provide you with an email message at the email address we have on file for you at that time providing you with the revised hardware and software requirements, at which time you will have the right to withdraw your consent.

**Acknowledging your access and consent to receive materials electronically**
To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.
By checking the 'I Agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify CrossCountry Mortgage Inc as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by  CrossCountry Mortgage Inc during the course of my relationship with you.

**Subject**
Complete with DocuSign: Gallo, Christopher SIGN ON 9.5.23.docx

**Document**
Gallo, Christopher SIGN ON 9.5.23.docx

**Document Id**
11bd8adb-5e7c-46e7-aaea-eab005573b72

**Recipients**
Christopher Gallo, Alex Ragon, Thea Kjaer

**Date Sent**
8/31/2023 | 08:46:09 am

**Date Created**
8/31/2023 | 08:44:22 am

**Status Date**
9/12/2023 | 12:54:00 pm

**Location**
Online

**Holder**
Thea Kjaer

**Time Zone**

Page 1 of 8

| Time | User | Action | Activity | Status |
|------|------|--------|----------|--------|
| 8/31/2023 \| 08:44:22 am | Thea Kjaer | Registered | The envelope was created by Thea Kjaer | Created |
| 8/31/2023 \| 08:46:09 am | Thea Kjaer | Sent Invitations | Thea Kjaer sent an invitation to Christopher Gallo [christopher.gallo@ccm.com] | Sent |
| 8/31/2023 \| 09:57:30 am | Christopher Gallo | Opened | Christopher Gallo opened the envelope [documents:(Gallo, Christopher SIGN ON 8.31.23.docx)] | Sent |
| 8/31/2023 \| 09:58:06 am | Christopher Gallo | Viewed | Christopher Gallo viewed the envelope [documents:(Gallo, Christopher SIGN ON 8.31.23.docx)] | Sent |
| 8/31/2023 \| 11:35:49 am | Christopher Gallo | Opened | Christopher Gallo opened the envelope [documents:(Gallo, Christopher SIGN ON 8.31.23.docx)] | Sent |
| 8/31/2023 \| 11:36:01 am | Christopher Gallo | Viewed | Christopher Gallo viewed the envelope [documents:(Gallo, Christopher SIGN ON 8.31.23.docx)] | Sent |
| 8/31/2023 \| 11:37:00 am | Christopher Gallo | Printable Copy Delivered | Christopher Gallo received a printable copy of the envelope | Sent |
| 8/31/2023 \| 02:28:46 pm | Thea Kjaer | Correction Initiated | Thea Kjaer initiated correction | Correct |
| 8/31/2023 \| 02:28:58 pm | Thea Kjaer | Corrected | Thea Kjaer changed the e-mail address christopher.gallo@ccm.com to cjgallo@ccm.com | Sent |
| 8/31/2023 \| 02:28:58 pm | Thea Kjaer | Correction Completed | Thea Kjaer completed correction | Sent |

| Language | IP | Source |
|---|---|---|
| English (us) | 162.203.35.2 | api |
| English (us) | 162.203.35.2 | api |
| English (us) | 76.99.100.187 | web |
| En | 76.99.100.187 | web |
| English (us) | 76.99.100.187 | web |
| En | 76.99.100.187 | web |
| En | 76.99.100.187 | web |
| English (us) | 162.203.35.2 | api |
| English (us) | 162.203.35.2 | api |
| English (us) | 162.203.35.2 | api |

| Time | User | Action | Activity | Status |
|------|------|--------|----------|--------|
| 8/31/2023 \| 02:29:00 pm | Thea Kjaer | Sent Invitations | Thea Kjaer sent an invitation to Christopher Gallo [cjgallo@ccm.com] | Sent |
| 8/31/2023 \| 02:29:04 pm | Thea Kjaer | Resent | Thea Kjaer resent the envelope to Christopher Gallo [cjgallo@ccm.com] | Sent |
| 9/6/2023 \| 08:43:30 am | Thea Kjaer | Correction Initiated | Thea Kjaer initiated correction | Correct |
| 9/6/2023 \| 08:44:05 am | Thea Kjaer | Corrected | Documents modified | Sent |
| 9/6/2023 \| 08:44:05 am | Thea Kjaer | Corrected | Recipient tabs modified for Christopher Gallo (cjgallo@ccm.com) | Sent |
| 9/6/2023 \| 08:44:05 am | Thea Kjaer | Corrected | Recipient tabs modified for Alex Ragon (aragon@myccmortgage.com) | Sent |
| 9/6/2023 \| 08:44:05 am | Thea Kjaer | Correction Completed | Thea Kjaer completed correction | Sent |
| 9/6/2023 \| 08:44:10 am | Thea Kjaer | Resent | Thea Kjaer resent the envelope to Christopher Gallo [cjgallo@ccm.com] | Sent |
| 9/10/2023 \| 09:11:00 pm | Christopher Gallo | Opened | Christopher Gallo opened the envelope [documents:(Gallo, Christopher SIGN ON 9.5.23.docx)] | Sent |
| 9/10/2023 \| 09:11:16 pm | Christopher Gallo | Viewed | Christopher Gallo viewed the envelope [documents:(Gallo, Christopher SIGN ON 9.5.23.docx)] | Sent |

| Language | IP | Source |
|---|---|---|
| English (us) | 162.203.35.2 | api |
| English (us) | 162.203.35.2 | web |
| English (us) | 162.203.35.2 | api |
| English (us) | 162.203.35.2 | api |
| English (us) | 162.203.35.2 | api |
| English (us) | 162.203.35.2 | api |
| English (us) | 162.203.35.2 | api |
| English (us) | 162.203.35.2 | web |
| English (us) | 108.35.43.28 | web |
| En | 108.35.43.28 | web |

| Time | User | Action | Activity | Status |
|------|------|--------|----------|--------|
| 9/10/2023 \| 09:35:02 pm | Email URL | Resent Expired Link | New link requested for email sent to cjgallo@ccm.com | Sent |
| 9/10/2023 \| 09:35:16 pm | Christopher Gallo | Opened | Christopher Gallo opened the envelope [documents:(Gallo, Christopher SIGN ON 9.5.23.docx)] | Sent |
| 9/10/2023 \| 09:35:30 pm | Christopher Gallo | Opened | Christopher Gallo opened the envelope [documents:(Gallo, Christopher SIGN ON 9.5.23.docx)] | Sent |
| 9/10/2023 \| 09:55:53 pm | Christopher Gallo | Opened | Christopher Gallo opened the envelope [documents:(Gallo, Christopher SIGN ON 9.5.23.docx)] | Sent |
| 9/10/2023 \| 09:55:59 pm | Christopher Gallo | Viewed | Christopher Gallo viewed the envelope [documents:(Gallo, Christopher SIGN ON 9.5.23.docx)] | Sent |
| 9/10/2023 \| 09:56:11 pm | Christopher Gallo | Signed | Christopher Gallo signed the envelope | Sent |
| 9/10/2023 \| 09:56:13 pm | Thea Kjaer | Sent Invitations | Thea Kjaer sent an invitation to Alex Ragon [aragon@myccmortgage.com] | Sent |
| 9/12/2023 \| 12:53:46 pm | Alex Ragon | Opened | Alex Ragon opened the envelope [documents:(Gallo, Christopher SIGN ON 9.5.23.docx)] | Sent |
| 9/12/2023 \| 12:53:49 pm | Alex Ragon | Viewed In-Session | Alex Ragon viewed the envelope in a session hosted by CrossCountry Mortgage, LLC [documents:(Gallo, Christopher SIGN ON 9.5.23.docx)] | Sent |
| 9/12/2023 \| 12:53:58 pm | Alex Ragon | Signed | Alex Ragon signed the envelope | Sent |

| Language | IP | Source |
|---|---|---|
| English (us) | 108.35.43.28 | web |
| English (us) | 108.35.43.28 | web |
| English (us) | 108.35.43.28 | web |
| English (us) | 108.35.43.28 | web |
| En | 108.35.43.28 | web |
| En | 108.35.43.28 | web |
| En | 108.35.43.28 | web |
| English (us) | 50.173.129.34 | web |
| En | 50.173.129.34 | web |
| En | 50.173.129.34 | web |

| Time | User | Action | Activity | Status |
|------|------|--------|----------|--------|
| 9/12/2023 \| 12:54:00 pm | Thea Kjaer | Printable Copy Attached to Email | Thea Kjaer was sent the document (Gallo, Christopher SIGN ON 9.5.23.docx.pdf) attached to the completed email | Completed |
| 9/12/2023 \| 12:54:00 pm | Thea Kjaer | Printable Copy Attached to Email | Thea Kjaer was sent the document (Summary.pdf) attached to the completed email | Completed |
| 9/12/2023 \| 12:54:00 pm | Christopher Gallo | Printable Copy Attached to Email | Christopher Gallo was sent the document (Gallo, Christopher SIGN ON 9.5.23.docx.pdf) attached to the completed email | Completed |
| 9/12/2023 \| 12:54:00 pm | Christopher Gallo | Printable Copy Attached to Email | Christopher Gallo was sent the document (Summary.pdf) attached to the completed email | Completed |
| 9/12/2023 \| 12:54:00 pm | Alex Ragon | Printable Copy Attached to Email | Alex Ragon was sent the document (Gallo, Christopher SIGN ON 9.5.23.docx.pdf) attached to the completed email | Completed |
| 9/12/2023 \| 12:54:00 pm | Alex Ragon | Printable Copy Attached to Email | Alex Ragon was sent the document (Summary.pdf) attached to the completed email | Completed |

| Language | IP | Source |
|---|---|---|
| En | 50.173.129.34 | web |
| En | 50.173.129.34 | web |
| En | 50.173.129.34 | web |
| En | 50.173.129.34 | web |
| En | 50.173.129.34 | web |
| En | 50.173.129.34 | web |



**BONUS AGREEMENT**

This Bonus Agreement ("Agreement") is entered into on <u>September 5, 2023</u> by and between **CrossCountry Mortgage, LLC**, a Delaware limited liability company ("Company") and **CHRISTOPHER GALLO** ("Employee") (collectively, the "Parties").

**RECITALS**

**WHEREAS,** Company desires to bestow upon the Employee a bonus in consideration for Employee's continued employment with the Company and remaining satisfactorily employed for the period of time stated herein.

**NOW, THEREFORE,** in consideration thereof and of the covenants hereafter set forth, the Parties hereby agree as follows:

1.      **INCORPORATION OF RECITALS.** The above recitals are incorporated herein by this reference.

2.      **SIGN-ON BONUS PAYMENT.** Company agrees to pay Employee a bonus in the sum of <u>Two Million One Hundred Thousand Dollars</u> ($2,100,000.00) (the "Bonus"). Company will pay the Bonus through its regular payroll, as follows:

☐ In one (1) payment within thirty days after Employee's first day of employment with Company

☒ In six (6) equal installments the first installment of which paid within thirty days after Employee's first day of employment with Company and the next two installments will pay on the next two payroll periods thereafter, the remaining three installments will pay on the tenth, eleventh and twelfth payroll periods after Employee's first day of employment with Company.

The Bonus shall be subject to all required taxes and withholdings applicable to bonuses.

The Parties agree that the Bonus is a recoverable bonus. To earn the Bonus, Employee must remain continuously employed with Company for thirty six (36) months starting on the Employee's first day of employment with Company (the "Vesting Period"). If Employee does not remain continuously employed with Company for the full Vesting Period, Employee must return the Bonus in full to Company, as set forth in Paragraph 3.

3.      **RETURN OF BONUS.** If the employment relationship between Employee and Company is terminated, either voluntarily or involuntarily, prior to the expiration of the Vesting Period, then Employee must return the entire Bonus to Company within ten (10) days of the termination date. If Employee does not return the Bonus pursuant to this Paragraph, the outstanding amount is delinquent and immediately collectible following the tenth (10th) day after the termination date. Time of

employment less than the full Vesting Period, including partial months of employment, does not reduce Employee's obligation to return the entire Bonus, under this Agreement.

4.    **FURTHER DOCUMENTS.** The Parties agree to execute any and all documents, and to perform any and all other acts, reasonably necessary to accomplish the purposes of this Agreement.

5.    **AT WILL EMPLOYMENT.** Nothing in this Agreement guarantees employment for any period of time. Employee shall be and remain an employee "at will".

6.    **ACKNOWLEDGEMENTS.** Employee understands s/he has the right to discuss this Agreement with any individual and, to the extent desired, Employee has taken advantage of this opportunity. Employee further acknowledges that s/he has carefully read and fully understands the provisions of this Agreement, and that s/he is voluntarily entering into the Agreement without any duress or pressure from Company. Employee also understands and acknowledges that this Agreement is the entire agreement between Employee and Company with respect to payment and return of the Bonus, and Employee acknowledges that Company has not made any other statements, promises or commitments of any kind (written or oral) to cause Employee to agree to the terms of this Agreement.

7.    **WAIVER.** The failure of a party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver nor shall it deprive such party of the right thereafter to insist upon strict adherence to that term or any term of this Agreement. Any waiver must be in writing and signed by the waiving party. If Company is the waiving party, such waiver must be signed by Company's President and Chief Executive Officer, Ronald J. Leonhardt, Jr.

8.    **MODIFICATION.** This Agreement may be supplemented, amended, or modified only by the mutual agreement of the Parties. No supplement, amendment, or modification of this Agreement shall be binding unless it is in writing and signed by the Employee and Company's President and Chief Executive Officer or Company's Chief Legal Counsel.

9.    **SEVERABILITY.** The Parties agree that should a court of competent jurisdiction declare or determine any provision of this Agreement to be illegal, invalid, or unenforceable, the remainder of the Agreement shall nonetheless remain binding and enforceable and the illegal, invalid or unenforceable provision(s) shall be modified only so much as necessary to comply with applicable law.

10.    **CHOICE OF LAW.** This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio (without regard to any conflicts of laws principles thereof that would give effect to the laws of another jurisdiction).

11.    **ARBITRATION; JURY WAIVER; COLLECTIVE ACTION WAIVER**. Employee agrees and acknowledges that Company and Employee will utilize binding arbitration to resolve all disputes arising out of or relating to this Agreement.  Both Company and Employee mutually agree that any claim, dispute and/or controversy that either Employee may have against Company (or its owners, directors, officers, managers, employees, and agents) or Company may have against Employee, arising from, related to, or having any relationship or connection whatsoever with this

Agreement, shall be submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act ("FAA"). Included within the scope of this Arbitration Agreement are all disputes, whether based in tort, contract, statute, equitable law, or otherwise.

Excluded from this arbitration provision are claims that are not arbitrable pursuant to federal or state law including workers' compensation claims, unemployment compensation claims, or the right to file an administrative charge before a governmental agency, such as the Equal Employment Opportunity Commission (EEOC), National Labor Relations Board (NLRB), or the Department of Labor (DOL), or other claims that as a matter of law cannot be subject to arbitration.

The following conditions are mutually agreed upon by both parties to this arbitration provision:

a) Any relief that would otherwise be available in a court action is equally available to the parties in connection with the arbitration proceedings;

b) In addition to any other requirements imposed by law, disputes shall be settled by binding arbitration administered by the American Arbitration Association ("AAA") before a qualified individual, to whom the parties may mutually agree pursuant to AAA's Employment Arbitration Rules and Mediation Procedures (found at https://www.adr.org), and shall be subject to disqualification on the same grounds as would apply to a judge of such court;

c) The procedures of the arbitration shall be governed by the Ohio Code of Civil Procedure and Ohio Rules of Court. To the extent permissible under applicable law, any and all hearings or other proceedings shall be held at a place in Cuyahoga County, Ohio;

d) The Arbitrator shall have the authority to allow for appropriate discovery and exchange of information before a hearing, including, but not limited to: interrogatories, requests for production of documents, requests for admission, depositions, and the issuance of subpoenas. The parties shall be permitted enough discovery to gather necessary evidence to prove their claims or defenses;

e) Awards shall include the Arbitrator's written and well-reasoned opinion(s). The Arbitrator shall issue a written opinion and award, in conformance with the following requirements: (i) the opinion and award must be signed and dated by the Arbitrator; (ii) the Arbitrator's opinion(s) and award shall decide all issues submitted; (iii) the Arbitrator's opinion and award shall set forth the legal principals supporting each part of the opinion(s); and (iv) the Arbitrator shall have the same authority to award remedies and damages as provided to a judge and/or jury under parallel circumstances in a civil action;

f) Company shall pay the costs associated with the arbitration, except for those costs which the employee would routinely be required to pay in court litigation. To the extent permissible under applicable law, each party shall be responsible for its own attorneys' fees, except that the Arbitrator may award attorneys' fees to the prevailing party consistent with applicable state or federal law;

g) Judgment upon the award rendered by the Arbitrator may be entered as a judgment in any court having jurisdiction thereof; and

**h) COMPANY AND EMPLOYEE AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN AN INDIVIDUAL CAPACITY AND NOT AS A PLAINTIFF OR CLASS REPRESENTATIVE/MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.**

This arbitration provision shall survive termination of this Agreement. The parties may only revoke or modify this arbitration provision with a written instrument, demonstrating the unambiguous, mutual intent of the parties, signed by Employee and the President/Owner(s) of Company. If a court or administrative body of competent jurisdiction deems any term of this arbitration provision illegal, otherwise invalid, or incapable of being enforced to any extent, such term or provision shall be severed to the extent of such invalidity or unenforceability; all other terms hereof shall remain in full force and effect; and, to the extent permitted and possible, Employee and Company agree that the body making the determination of invalidity or unenforceability shall have the power to replace the invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and that this arbitration provision shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

Employee understands and agrees that both Employee and Company give up the right to trial by jury of any claim each may have against the other. Employee understands that the AAA's filing fees are typically more expensive than the filing fees in a court of law. Further, the AAA may interpret and enforce the rules of procedure and evidence in a different manner than a court of law or administrative body. For a full set of the AAA's rules and more information on the AAA's arbitration process, please visit www.adr.org. Employee's signature below indicates Employee's agreement to the alternative dispute resolution processes described herein.

**EMPLOYEE**                                    **CROSSCOUNTRY MORTGAGE, LLC**

_Christopher Gallo_                    By: _Alex Ragon_
—————————————————                    —————————————————
Christopher Gallo                               Alex J. Ragon, Chief Legal Counsel

**DocuSign**

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: 998C05080C8E4030BA1214CB185F3593 | | Status: Completed |
| Subject: Complete with DocuSign: Gallo, Christopher SIGN ON 9.5.23  REV.docx | | |
| Source Envelope: | | |
| Document Pages: 4 | Signatures: 2 | Envelope Originator: |
| Certificate Pages: 2 | Initials: 0 | Thea Kjaer |
| AutoNav: Enabled | | 6850 miller road |
| EnvelopeId Stamping: Enabled | | Brecksville, OH  44141 |
| Time Zone: (UTC-05:00) Eastern Time (US & Canada) | | thea.lutz@myccmortgage.com |
| | | IP Address: 162.203.35.2 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Thea Kjaer | Location: DocuSign |
|     11/8/2023 10:31:52 AM |     thea.lutz@myccmortgage.com | |

## Signer Events

| Signer Events | Signature | Timestamp |
|---|---|---|
| Christopher Gallo<br>cjgallo@ccm.com<br>CrossCountry Mortgage, LLC<br>Security Level: Email, Account Authentication (None) | *Christopher Gallo*<br>505A38D62B9B42E...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 108.35.39.217 | Sent: 11/8/2023 10:33:48 AM<br>Resent: 11/8/2023 3:10:55 PM<br>Resent: 11/8/2023 3:11:08 PM<br>Resent: 11/8/2023 3:13:14 PM<br>Viewed: 11/8/2023 3:40:12 PM<br>Signed: 11/8/2023 3:40:22 PM |
| **Electronic Record and Signature Disclosure:**<br>    Not Offered via DocuSign | | |
| Alex Ragon<br>aragon@myccmortgage.com<br>Chief Legal Counsel<br>CrossCountry Mortgage Inc<br>Security Level: Email, Account Authentication (None) | *Alex Ragon*<br>A407916AAB2E4CB...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 50.173.129.34 | Sent: 11/8/2023 3:40:23 PM<br>Viewed: 11/14/2023 1:54:00 PM<br>Signed: 11/14/2023 1:54:09 PM |
| **Electronic Record and Signature Disclosure:**<br>    Not Offered via DocuSign | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Thea Kjaer<br>thea.lutz@myccmortgage.com<br>HR Specialist<br>CrossCountry Mortgage, LLC<br>Security Level: Email, Account Authentication (None) | **COPIED** | Sent: 11/14/2023 1:54:09 PM |
| **Electronic Record and Signature Disclosure:**<br>    Not Offered via DocuSign | | |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
| --- | --- | --- |

| Envelope Summary Events | Status | Timestamps |
| --- | --- | --- |
| Envelope Sent | Hashed/Encrypted | 11/8/2023 10:33:48 AM |
| Envelope Updated | Security Checked | 11/8/2023 3:10:54 PM |
| Certified Delivered | Security Checked | 11/14/2023 1:54:00 PM |
| Signing Complete | Security Checked | 11/14/2023 1:54:09 PM |
| Completed | Security Checked | 11/14/2023 1:54:09 PM |

| Payment Events | Status | Timestamps |
| --- | --- | --- |

**Subject**
Complete with DocuSign: Gallo, Christopher SIGN ON 9.5.23 REV.docx

**Document**
Gallo, Christopher SIGN ON 9.5.23 REV.docx

**Document Id**
998c0508-0c8e-4030-ba12-14cb185f3593

**Recipients**
Christopher Gallo, Alex Ragon, Thea Kjaer

**Date Sent**
11/8/2023 | 10:33:48 am

**Date Created**
11/8/2023 | 10:31:52 am

**Status Date**
11/14/2023 | 01:54:09 pm

**Location**
Online

**Holder**
Thea Kjaer

**Time Zone**

| Time | User | Action | Activity | Status |
|------|------|--------|----------|--------|
| 11/8/2023 \| 10:31:52 am | Thea Kjaer | Registered | The envelope was created by Thea Kjaer | Created |
| 11/8/2023 \| 10:33:48 am | Thea Kjaer | Sent Invitations | Thea Kjaer sent an invitation to Christopher Gallo [christopher.gallo@ccm.com] | Sent |
| 11/8/2023 \| 10:43:11 am | Christopher Gallo | Opened | Christopher Gallo opened the envelope [documents:(Gallo, Christopher SIGN ON 9.5.23 REV.docx)] | Sent |
| 11/8/2023 \| 03:10:21 pm | Thea Kjaer | Correction Initiated | Thea Kjaer initiated correction | Correct |
| 11/8/2023 \| 03:10:26 pm | Thea Kjaer | Correction Cancelled | Thea Kjaer cancelled correction | Sent |
| 11/8/2023 \| 03:10:40 pm | Thea Kjaer | Correction Initiated | Thea Kjaer initiated correction | Correct |
| 11/8/2023 \| 03:10:54 pm | Thea Kjaer | Corrected | Thea Kjaer changed the e-mail address christopher.gallo@ccm.com to cjgallo@ccm.com | Sent |
| 11/8/2023 \| 03:10:54 pm | Thea Kjaer | Correction Completed | Thea Kjaer completed correction | Sent |
| 11/8/2023 \| 03:10:55 pm | Thea Kjaer | Sent Invitations | Thea Kjaer sent an invitation to Christopher Gallo [cjgallo@ccm.com] | Sent |
| 11/8/2023 \| 03:11:09 pm | Thea Kjaer | Resent | Thea Kjaer resent the envelope to Christopher Gallo [cjgallo@ccm.com] | Sent |

| Language | IP | Source |
|---|---|---|
| English (us) | 162.203.35.2 | api |
| English (us) | 162.203.35.2 | api |
| English (us) | 76.99.100.187 | web |
| English (us) | 162.203.35.2 | api |
| English (us) | 162.203.35.2 | api |
| English (us) | 162.203.35.2 | api |
| English (us) | 162.203.35.2 | api |
| English (us) | 162.203.35.2 | api |
| English (us) | 162.203.35.2 | api |
| English (us) | 162.203.35.2 | web |

| Time | User | Action | Activity | Status |
|------|------|--------|----------|--------|
| 11/8/2023 \| 03:13:14 pm | Thea Kjaer | Resent | Thea Kjaer resent the envelope to Christopher Gallo [cjgallo@ccm.com] | Sent |
| 11/8/2023 \| 03:39:55 pm | Christopher Gallo | Opened | Christopher Gallo opened the envelope [documents:(Gallo, Christopher SIGN ON 9.5.23 REV.docx)] | Sent |
| 11/8/2023 \| 03:40:12 pm | Christopher Gallo | Viewed | Christopher Gallo viewed the envelope [documents:(Gallo, Christopher SIGN ON 9.5.23 REV.docx)] | Sent |
| 11/8/2023 \| 03:40:22 pm | Christopher Gallo | Signed | Christopher Gallo signed the envelope | Sent |
| 11/8/2023 \| 03:40:23 pm | Thea Kjaer | Sent Invitations | Thea Kjaer sent an invitation to Alex Ragon [aragon@myccmortgage.com] | Sent |
| 11/10/2023 \| 10:54:04 am | Christopher Gallo | Opened | Christopher Gallo opened the envelope [documents:(Gallo, Christopher SIGN ON 9.5.23 REV.docx)] | Sent |
| 11/10/2023 \| 10:54:10 am | Christopher Gallo | Viewed | Christopher Gallo viewed the envelope [documents:(Gallo, Christopher SIGN ON 9.5.23 REV.docx)] | Sent |
| 11/14/2023 \| 01:53:57 pm | Alex Ragon | Opened | Alex Ragon opened the envelope [documents:(Gallo, Christopher SIGN ON 9.5.23 REV.docx)] | Sent |
| 11/14/2023 \| 01:54:00 pm | Alex Ragon | Viewed In-Session | Alex Ragon viewed the envelope in a session hosted by CrossCountry Mortgage, LLC [documents:(Gallo, Christopher SIGN ON 9.5.23 REV.docx)] | Sent |
| 11/14/2023 \| 01:54:09 pm | Alex Ragon | Signed | Alex Ragon signed the envelope | Sent |

| Language | IP | Source |
|---|---|---|
| English (us) | 162.203.35.2 | web |
| English (us) | 108.35.39.217 | web |
| En | 108.35.39.217 | web |
| En | 108.35.39.217 | web |
| En | 108.35.39.217 | web |
| English (us) | 181.214.235.117 | web |
| En | 181.214.235.117 | web |
| English (us) | 50.173.129.34 | web |
| En | 50.173.129.34 | web |
| En | 50.173.129.34 | web |

| Time | User | Action | Activity | Status |
|------|------|--------|----------|--------|
| 11/14/2023 \| 01:54:10 pm | Thea Kjaer | Printable Copy Attached to Email | Thea Kjaer was sent the document (Gallo, Christopher SIGN ON 9.5.23 REV.docx.pdf) attached to the completed email | Completed |
| 11/14/2023 \| 01:54:10 pm | Thea Kjaer | Printable Copy Attached to Email | Thea Kjaer was sent the document (Summary.pdf) attached to the completed email | Completed |
| 11/14/2023 \| 01:54:10 pm | Christopher Gallo | Printable Copy Attached to Email | Christopher Gallo was sent the document (Gallo, Christopher SIGN ON 9.5.23 REV.docx.pdf) attached to the completed email | Completed |
| 11/14/2023 \| 01:54:10 pm | Christopher Gallo | Printable Copy Attached to Email | Christopher Gallo was sent the document (Summary.pdf) attached to the completed email | Completed |
| 11/14/2023 \| 01:54:10 pm | Alex Ragon | Printable Copy Attached to Email | Alex Ragon was sent the document (Gallo, Christopher SIGN ON 9.5.23 REV.docx.pdf) attached to the completed email | Completed |
| 11/14/2023 \| 01:54:10 pm | Alex Ragon | Printable Copy Attached to Email | Alex Ragon was sent the document (Summary.pdf) attached to the completed email | Completed |
| 11/3/2025 \| 04:02:14 pm | Briana Meadwell Meadwell | Printable Copy Delivered | Briana Meadwell Meadwell received a printable copy of the envelope | Completed |

| Language | IP | Source |
|---|---|---|
| En | 50.173.129.34 | web |
| En | 50.173.129.34 | web |
| En | 50.173.129.34 | web |
| En | 50.173.129.34 | web |
| En | 50.173.129.34 | web |
| En | 50.173.129.34 | web |
| English (us) | 155.190.17.5 | api |

**VIA Email**

April 24, 2024

Christopher Gallo
cjgallo@gmail.com

**Subject:**       **Notice of Sign-On Bonus Return**

Dear Christopher,

This letter serves to notify you of your obligation to repay the outstanding amount of your sign-on bonus following your termination with CrossCountry Mortgage, LLC ("CrossCountry").

As a reminder, the terms of your Sign-On Bonus Agreement ("Agreement") require you to repay the sign-on bonus within ten (10) days of your termination. The final calculation of the outstanding amount owed back to CrossCountry is pending payment of your final paycheck.

CrossCountry intends to enforce the terms of the Agreement and will pursue all legal methods of recapture should you fail to comply with your obligations under the Agreement.

I appreciate your anticipated cooperation in this matter. If you have any questions or concerns, please do not hesitate to contact me at joseph.mallernee@myccmortgage.com or 440-701-5548.

Very truly yours,

/s/ Joseph A. Mallernee
**Joseph Mallernee, Esq.**
Associate Corporate Counsel

cc:     Alex J. Ragon
        Chief Legal Counsel

